[No. A097703. First Dist., Div. Two. July 2, 2003.]

HARRY W. LOW, as Insurance Commissioner, etc., Plaintiff, v. GOLDEN EAGLE INSURANCE COMPANY, Defendant and Appellant; LEONARD ARMATO et al., Claimants and Respondents.

## COUNSEL

The Louderback Law Firm and Stacey L. Pratt for Defendant and Appellant.

Owens & Gach Ray, Robert B. Owens and Linda Gacy Ray for Claimants and Respondents.

OPINION

**LAMBDEN, J.**—Claimants Leonard Armato (Armato) and Liz Stewart Development & Design, Inc. (LSD&D), successor in interest to insured general contractor Armato Development, Inc. (ADI), applied in these proceedings (Ins. Code, § 1032 et seq.) for an order to show cause (OSC) why insurer-in-conservation Golden Eagle Insurance Company (Golden Eagle) should not pay expenses they incurred in resolving a third party action brought against them for construction defects. Golden Eagle Insurance Corporation (GEIC), as third party claims administrator, appeals a judgment that grants the application in part.[1] We reverse the grant of relief.

## BACKGROUND

This case involves a Southern California lawsuit filed in September 1996 against Armato, LSD&D (ADI's successor in interest) and others by two homeowners based on alleged construction defects in a residence ADI had built beginning in late 1990 and sold to the plaintiffs in January 1993 (*Newcombe et al. v. Lott et al.* (Super. Ct. L.A. County, 1996, No. SC 043 565) (the lawsuit or Newcombe lawsuit).

A commercial general liability (CGL) policy (No. CCP 17 25 74) was issued to ADI by Golden Eagle effective December 24, 1991 and was canceled effective February 24, 1992 for nonpayment of premium. It describes ADI's business as "real estate development" and shows its mailing address as 1875 Century Park East, 12th floor, Los Angeles. Two policy conditions required ADI, in the event of a claim or suit, to give Golden Eagle notice "as soon as practicable" and to "[c]ooperate ... in the investigation, settlement or defense of the claim or 'suit' " (the notice and cooperation clauses). A third condition provided that "[n]o insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent" (a no-voluntary-payments or NVP provision).

At issue are the effects of the notice, cooperation and NVP provisions given correspondence between the parties over a period of time in which Armato settled the lawsuit without notice to, or participation by, GEIC. The

---

[1] All unspecified section references are to the Insurance Code.

In 1997, the California Insurance Commissioner (Commissioner) was appointed conservator of Golden Eagle and, in turn, appointed newly formed GEIC as third party claims administrator to process and determine "covered" claims (see § 1063.1, subd. (c)(1)) against Golden Eagle. Under a final order of the San Francisco Superior Court approving a rehabilitation plan, GEIC's claims decisions are subject to review by that court in OSC proceedings under section 1032 et seq.

facts are complicated by assertions by claimants and their trial counsel, Robert Owens (also appellate counsel), that claimants never received some of the correspondence. In the end, the trial court held that the NVP provision barred claimants' recovery of pre-tender expenses but that the notice and cooperation provisions did not bar posttender expenses given that GEIC had also been at fault and had not met its burden, on the latter provisions, to show substantial prejudice. The court ordered the matter returned to GEIC to sort out which of claimants' expenses might be barred as pre-tender.[2]

## THE NEWCOMBE LAWSUIT

A first amended complaint filed September 3, 1996 (the complaint) in the Newcombe lawsuit named various defendants, including the corporation LSD&D (as successor to ADI), and individuals Leonard Armato (as an attorney) and Liz Stewart—Liz Stewart Armato until dissolution of her marriage to Armato—(as a real estate sales person for a codefendant real estate broker). While not specifically sued in that capacity, Stewart was also a principal in her namesake corporation, LSD&D, and the complaint did allege that she was a licensed general contractor. Attorney Owens of the firm Owens & Gach Ray represented Stewart, LSD&D, Armato, Management Plus Enterprises, and first-named defendant Ronald M. Lott.[3]

## CLAIMS CHRONOLOGY

We set out the claims events and correspondence in chronological order.

*September 3, 1996.* The complaint in the Newcombe lawsuit is filed. No cross-complaint is filed, but "in lieu" of one, a separate action is filed (date unstated) against various subcontractors, only to be dismissed when it develops that virtually all of them were out of business, deceased, defunct or bankrupt.

*October 21, 1998.* Over two years after the complaint, Owens tenders the defense to GEIC by letter, identifying the policy and LSD&D as ADI's successor corporation, and stating that the insured has "just located" the policy declarations page. He states that his firm has filed an answer, encloses copies of the complaint, answer and policy declarations page, asks for approval to be the insured's counsel, and asks for immediate attention as time is of the essence since the court has set a trial date of January 12, 1999.

---

[2] The court also denied claimants leave to file a bad-faith action in superior court, but claimants have not challenged or cross-appealed that ruling.

[3] Lott is identified in the complaint as National Football League player Ronnie Lott, and it is alleged that the residence, while actually built as a " 'spec' (speculation) house for immediate resale," was falsely marketed as having been custom built for Lott with "no expense spared" in the quality of construction and materials.

*October 28, 1998.* A letter from GEIC acknowledges receipt of the claim and notice of the lawsuit, advises that the matter will be investigated and asks that any documents about the matter be gathered in preparation for a meeting with the assigned examiner or investigator. Oddly, the letter is addressed to ADI, not the successor or Owens, and uses the Century Park East address shown on the 1991 policy.

*November 11, 1998.* A letter from GEIC claims representative Rodger Hartnett to ADI, again at ADI's policy address, acknowledges the tender again and asks that, in order to assist in the investigation and evaluation, ADI provide the complaint, any cross-complaints naming subcontractors hired by ADI, any subcontracts and documentation of the work done by ADI, any other insurers, and any information on how complaints might relate to ADI's scope of work. The letter asks for prompt attention and advises that GEIC's action is taken under a full reservation of rights.

*November 18, 1998.* Hartnett sends two letters. One is again to ADI, but at a Beverly Hills address (unexplained by any party here) on Wetherly Drive. It states that GEIC "will be providing you with a full defense of this lawsuit" but under a full reservation of rights, cautions that there may ultimately be only limited or perhaps no coverage, and sets out at some 10 pages' length—based on "very limited information provided to date"—how various policy provisions might affect coverage.

According to declarations by Armato, Stewart, Owens and his law partner, none of the above letters of October 28, November 11 (referred to by them as dated November 12) or November 18 was received or seen by them at the time.

The second Hartnett letter is to Owens. It lacks any policy analysis and, oddly, does not mention the acceptance of tender made that same day in the letter to ADI. One may infer, however, that Hartnett had accepted the tender as to ADI but was still unsure as to LSD&D. He states: "As you are aware, [GEIC] previously acknowledged receipt of your tender of defense on behalf of our insured, [ADI], as well as [LSD&D], successor in interest to [ADI]. Included in that response was a request for additional information which has not as yet been provided." Hartnett also asks for any documents reflecting the change in ownership or restructuring between ADI and LSD&D, and the names of any other insurers for either entity after the Golden Eagle policy. It closes, "Upon review and analysis of this information, we will be in a better position to respond to your request that we participate in this defense."

*November 30, 1998.* Owens writes in response to the last letter asking that the referenced initial response and request for information be faxed to him

immediately because he does not have one. As for the requested further information, Owens states that documents about the entities ("if there are any") will be provided forthwith and that he is currently unaware of any other insurance carriers. He closes, in apparent reference to the trial date, "Due to the extreme time constraints under which we are operating, your immediate response and assumption of the defense is imperative."

*Settlement agreement.* There follows a two-month gap in the correspondence, with Hartnett giving no "immediate response," presumably because of the successorship issue, and Owens giving no information on the issue. During this time, Owens negotiates and executes a settlement in the Newcombe action without notifying GEIC and without having intimated—short of warning of a January 12 trial date—that any settlement was in the works. From his declaration of not having received Hartnett's November 18 letter to ADI, we gather that Owens was unaware that GEIC had accepted the tender as to ADI.

A settlement agreement and mutual release, effective January 25, was signed on February 1 by Armato (individually and as president of Management Plus Enterprises) and February 17 by Stewart. The document and related parts of the briefing are before us under seal, but the terms pertinent to the appeal issues do not require recital except as to claimants, particularly Armato. A sum is to be paid by "Defendants," with no allocation specified, and plaintiffs in turn dismiss as to each defendant and "transfer back title and ownership" of the property to them "by means of a grant deed to Armato," the transfer to be treated as "a rescission of the original contract" of purchase. Payment and transfer are made contingent on conditions precedent that (1) Armato get approval for a loan on the property secured by a first trust deed for $1,575,000 (about the alleged purchase price), (2) Armato obtain title insurance by the close of escrow, (3) defendants get a court determination of good faith settlement, and (4) Armato take possession at the close of escrow.

As explained by Armato in a declaration below, he was named as a defendant although he "had no involvement or participation in the construction of the house." He hired the Owens firm to defend himself, his former wife, Stewart, and her companies and advanced over $174,000 for legal services, "primarily to defend my former wife and her companies ...." He also spent funds to purchase the house, fix it up and resell it and, by his accounting, in the end "advanced" over $155,500. He claims the settlement structure allowed him "to cap the defendants' losses at an amount which is a mere fraction of the projected exposure." Stewart declares that she was

unable to afford the defense of herself or the companies (LSD&D and ADI) and that Armato agreed to advance payment of "their bills" on her behalf.[4]

*February 9, 1999.* Hartnett, unaware of the settlement, reiterates that GEIC has already (on Nov. 18) requested information on the "alleged" succession so that LSD&D "would qualify as an insured" under the policy issue to ADI, but has so far received none. "Therefore," he advises, "we are unable to provide a defense to Elizabeth Stuart [*sic*] Development & Design. [¶] Furthermore, since we have received no further correspondence from you, we assume that the January 12, 1990 [*sic*] trial date has been continued and we request the current status of this litigation."

*February 19, 1999.* Owens, without disclosing the settlement or correcting Hartnett's assumption that the trial date was continued, replies that he had only said he would provide succession documents *if there were any* and that none had been located yet. He says he is still awaiting the tender— correspondence he requested in his November 30th letter and warns: "I assure you that LSD&D is the successor and the continued bad faith delay by Golden Eagle in assuming the defense and indemnification of its insured is causing extreme hardship on your insured. Guide yourselves accordingly."

*February 23, 1999.* In a follow-up letter, Owens encloses a copy of a 1992 certificate amending the articles of incorporation to read that the name of the corporation was LSD&D. He again requests defense and indemnification and advises for the first time, though without mention of a written agreement having been negotiated and signed, "We are in the process of working out a settlement that will avoid a protracted, expensive Trial, and your insured needs the assistance of its insurer, Golden Eagle."

*April 1, 1999.* In a second follow-up letter, Owens complains of delay and reveals for the first time, "[Y]our insured had no choice but to settle with the Plaintiffs." He asks GEIC to "fund the settlement [and] to reimburse the substantial legal fees and costs that were incurred defending the case," threatening to sue if he gets no reply by the 15th.

*April 23, 1999.* Hartnett responds that, based on the documents provided and an analysis by coverage counsel Glenn White, GEIC "acknowledges its duty to defend and indemnify" ADI, including (for the first time) its operation under the name LSD&D, all "subject to the reservation of rights letter issued

---

[4] She also declared: "I have agreed and signed a written Stipulation that provides that Leonard Armato is entitled to pursue all claims against GEIC as the assignee of ADI, the insured under the Policy. Any and all proceeds which are ultimately paid on the Claim are to be made jointly payable to Mr. Armato and [LSD&D], the successor and [*sic*] interest of ADI." The *stipulation is not part of the record.*

by our company on November 12, 1998"—alluding evidently to the November *11* letter addressed to ADI. He says to look for a letter from White and asks that, since the case has now been settled, Owens submit all documents about the lawsuit's defense, including an analysis of the damages, all expert reports and all fees incurred by Owens's firm. "After our review of these documents," he closes, "we will discuss with you and our insured, Golden Eagle's position with regard to reimbursement of those fees."

*May 4, 1999.* The Los Angeles Superior Court in the Newcombe lawsuit issues a nunc pro tunc order for specific performance, rescinding a 1993 deed from Armato to the Newcombes and restoring title to Armato. This is based on findings that all conditions precedent have occurred and that the parties had "come to terms to resolve this case" and placed on the record a resolution to that effect back in December 1998.

*June 1, 1999.* Responding to the April 23 letter from Hartnett, Owens's partner, Linda Gach Ray, writes to Hartnett's successor, Joe Warren, detailing (with attachments not in our record) the alleged construction defects, damages estimates, expert reports and expenses. A confidential settlement agreement, Gach Ray adds, "called for the Defendants to repurchase the property from Plaintiffs, repair the defects, and re-sell the property. The property has been acquired and repairs are being made. It is anticipated that the ultimate expense to the Defendants' in this Settlement will be approximately $300,000."

*July 7, 1999.* White writes to Gach Ray saying he is coverage counsel for GEIC and is "evaluating its obligations." He asks for the settlement documents.

*July 8, 1999.* Gach Ray prods White for action and to say she hopes that his phrase, "evaluating its obligations," really meant evaluating "the extent" of the obligations. She says she is securing a release of the settlement documents from the parties.

*August 18, 1999.* Gach Ray writes to White, in response to an August 10 letter from him (evidently not in our record). She expresses chagrin at his mention that he had not found any "communication ... requesting that Golden Eagle participate in the settlement" and says GEIC's own "inaction" or "stonewalling" in not acknowledging its duties back in November or December caused the lack of consultation.

*September 13, 1999.* White writes to Gach Ray, after a phone conversation that day, to say they had not yet received a copy of the settlement agreement and that upon receiving it, White would "expedite a completion of our coverage analysis" and provide her "with Golden Eagle's coverage conclusions."

*September 16, 1999.* A letter from Gach Ray to White states that White now has a copy of the settlement agreement and urges resolution.

*October 1, 1999.* Gach Ray prods again, responding to a voice mail message that White would be recommending "a number" to GEIC for its authorization.

*October 1, 1999.* White writes back: "Golden Eagle continues to evaluate your claim, leaving all of its options open. As I have repeatedly informed you, Golden Eagle has reserved its rights, and continues to reserve all of its rights with respect to your claim. A response to your tender will be provided shortly." His answer would take another eight months, with some communications apparently not in our record.

*December 8, 1999.* Gach Ray writes referring to White's request for "access to the litigation files," saying arrangements had been made to review them but that White had not done so yet.

*January 28, 2000.* Gach Ray again asks for GEIC's position. She details her file history of communications and threatens bad faith litigation.

*June 5, 2000.* Claimants have separate counsel and are no longer represented by Owens & Gach Ray. In a letter to new counsel for Stewart (Robert Hindin) and Armato (Howden Fraser), White denies the claim and rejects any duty to defend or indemnify. He outlines the history and facts, concluding that claimants deprived GEIC of its "rights to effectively defend" the claim by failing to give timely notice of the claim, conducting a conflicted defense (Owens's law firm having representing all defendants), and settling without giving GEIC an opportunity to participate. White cites breach of the policy's notice, cooperation and NVP provisions. "Moreover," he writes, the settlement "was not a covered settlement. [It] was an agreement between the parties to rescind the sale and purchase of the 'spec' home in question. Such a settlement to rescind a contract arguably does not involve covered damages under the Golden Eagle policy. Specifically, Golden Eagle contends that the settlement does not involve a compromise of property damage or bodily injury claims, and concerns only contractual claims." White notifies claimants of their right to seek OSC review.

OSC PROCEEDINGS

*Application.* Claimants filed their application on June 30, 2000. Against GEIC's untimely notice basis for rejection, they argued that notification in October 1998, two years after the lawsuit's filing, was timely in the circumstances. Stewart declared that, after the completion of the house in 1992, she

had gone through a separation and divorce and moved her residence and office. "[D]espite a diligent search for all documentation regarding my insurance coverages," she explained without elaboration, she "could not locate the Policy until sometime in mid-October," whereupon she "immediately turned it over" to Owens. On GEIC's conflicted-defense basis, claimants argued that they did not understand what GEIC meant by this but that there was nothing to it. On rescission not being a covered settlement term, claimants argued that this argument came "too late" and that, had GEIC taken this position right after tender of the claim, claimants would not have structured the settlement to include rescission (an argument ignoring that notice of possible settlement was first given in February 1999, long after the October 1998 tender and after the settlement terms had been drafted and signed).

On the denied-opportunity-to-participate basis, claimants argued that GEIC's own actions and delays caused it. GEIC had sent its initial acceptance with reservations letter to an old address for ADI, and if GEIC had "reacted immediately" to Owens's February 23, 1999, letter about " 'working out a settlement,' " it would have had the opportunity to participate. (This, again, did not confront that the agreement was already drawn up and signed by then but stressed various delays in GEIC's responses.) Claimants also argued that GEIC was *estopped*, by its own actions and delays, from complaining about the lack of participation.

Armato and Stewart and counsel Owens and Gach Ray each submitted supporting declarations (discussed in part, *ante*), and Armato submitted a one-page accounting of his claimed expenses regarding the property. He explained that he settled the lawsuit after personally advancing over $100,000 in legal expenses and after it became clear in 1998, from the plaintiffs' expert witnesses, that the plaintiffs "were seeking in excess of $400,000." He sought indemnity for about $155,000, including $148,505 he claimed as his total net expenses in the purchase, repair and resale of the property.

*Opposition.* GEIC responded to each of the arguments and declarations, also submitting postapplication correspondence with Owens showing that his firm had jointly represented claimants along with several other defendants and that no cross-complaints had been filed. On the timeliness of the claim notification, GEIC observed that even if Stewart truly first discovered the policy in October 1998, she never said she was unaware of Golden Eagle's identity as her insurer before then. On the opportunity to participate in settlement, GEIC noted claimants' failure to provide requested documents or keep GEIC advised of settlement talks. Also, neither the settlement terms nor any evidence allowed an allocation of legal costs as between the several jointly represented defendants—most of whom GEIC did not insure—or their

respective liability exposures as sellers, realtors and developers, while GEIC's liability related only to a two-month period during early development. Armato's claim of potential exposure of $400,000 was not corroborated, and since the sale of the house did not occur until January 1993, long after the policy lapsed, it did not appear that any covered liability for bodily injury or property damage existed. Further, the equitable relief of rescission secured under the settlement did not constitute covered property damage or bodily injury caused by an occurrence within the policy period. Stewart's declaration of Armato having standing to pursue claims against GEIC as an assignee of LSD&D was unsupported by any actual agreement and was suspect, in any event, because she declared that any proceeds were "jointly payable" to Armato and LSD&D (see fn. 4, *ante*). Finally, GEIC was not estopped to rely on the policy breaches. Claimants could not show any detrimental reliance, and GEIC had accepted tender under a full reservation of rights. GEIC had responded by requesting documents necessary to evaluate the claim, and claimants had not advised GEIC that they were preparing to settle the case or requested GEIC's participation in that settlement.

*Reply.* Stewart had previously declared that, despite a "diligent search for all documentation regarding [her] insurance coverages," it was not until mid-October that she was able to "locate the Policy ...." Now, to meet GEIC's observation that she never denied knowing that Golden Eagle was ADI's insurer, she further declared that, before locating the policy, she "had no specific or independent recollection that GEIC had been the insurer for ADI or me in or about 1991 or 1992 ...."

*Sur-reply.* GEIC argued, against the claimants' view, that it had not waived any coverage defenses and stressed that claimants offered no argument *but* waiver against its lack-of-covered-damages position. Further, the settlement was potentially collusive, and claimants had implicitly conceded that neither of them contributed any money toward it.

*Argument.* A hearing on the application produced little clarification. Owens, arguing for claimants, told the court that he did not know why he had not mentioned the settlement to GEIC before April 1999 but stressed that the settlement, with conditions for the retransfer of property, was signed but "by no means a done deal" in February 1999. The court asked Owens how LSD&D had "standing" to seek reimbursement given that LSD&D, the insured, paid nothing in the settlement, that only Armato, a *non*insured, incurred costs, and that no evidence of any reimbursement agreement had been presented. Owens suggested that the advanced funds might have been "taken into account" in family law proceedings between Stewart and Armato. He offered to "provide some further information or declarations along this line" but ultimately never did. Neither side conceded any issues, and the court took the matter under submission.

*Ruling.* The court's 10-page written order was filed 10 weeks later, on December 3, 2001. It rested on conclusions about the notice, cooperation and NVP provisions. The court noted first that NVP provisions are generally enforceable to bar pre-tender expenses regardless of prejudice to the insurer and that no exception arose in this case. Thus, there was no duty to indemnify for pre-tender expenses. It being unclear from Armato's declaration what part of the claimed costs and expenses might have been pre-tender, the court ordered a remand for GEIC to make that determination.

Turning then to the effect of the notice and cooperation provisions on posttender expenses, the court noted a burden of showing substantial prejudice and concluded that GEIC had not met that burden, thus leaving the provisions unenforceable. The prejudice conclusion rests on a sort of comparative-harm analysis. The court seemingly accepted "arguable" prejudice from the lateness of the tender and Owens's failure to advise of the settlement. On the other hand, the court found "unexcusable" the "contradictory" letters of November 18, 1998, in which GEIC accepted tender (with reserved rights) as to ADI but not as to LSD&D, and did not advise Owens of the ADI acceptance. Also "difficult to justify" for the court was GEIC's failure to take quick action on Owens's November 30th request to respond immediately and assume the defense. Thus, and despite Owens's failure to mention the settlement or disabuse Hartnett of his assumption that a January trial date had been continued, "Golden Eagle's own conduct compounded any problems created by late notice and lack of full cooperation by the insured," and GEIC was "not substantially prejudiced by failure of the insured to comply ...."

The only other issue reached in the order is GEIC's conflicted-defense objection, which the court, in footnote, construed as meaning that independent counsel should have been appointed under Civil Code section 2860 because of a conflict of interest between insured and insurer. The court reasoned that "the issue never arose," meaning, it seems, that GEIC never actually undertook to defend the insured.[5] No mention is made of other issues, notably coverage, "standing" or estoppel.

GEIC filed timely notice of appeal on January 30, 2002.

---

[5] Not that this would have altered its overall assessment of prejudice, but the court, it seems, may have overlooked that GEIC was raising "conflicted defense" *as prejudice,* i.e., that one law firm had represented multiple defendants in an unallocated settlement where only one (LSD&D) was insured and potentially owed any indemnification.

## DISCUSSION

### I. Review Standards

In these special proceedings for an insurer in conservation, the actions of the Commissioner are subject to judicial review, but not de novo review. The trial court reviews them under an abuse of discretion standard, asking if the action was arbitrary, i.e., unsupported by a rational basis, contrary to specific statute or discriminatory. We also test the action of the trial court by an abuse of discretion standard, employing the equivalent of the substantial evidence test by accepting the trial court's resolution of credibility and conflicting substantial evidence, and its choice of possible reasonable inferences. (*In re Executive Life Ins. Co.* (1995) 32 Cal.App.4th 344, 358 [38 Cal.Rptr.2d 453].) Thus our review of factual matters is highly deferential. While the court below issued a written ruling, these special proceedings do not require written findings of fact or conclusions of law. (*Carpenter v. Pacific Mut. Life Ins. Co.* (1937) 10 Cal.2d 304, 325–328 [74 P.2d 511].) Thus it appears that we may, and must, infer from the judgment any reasonable findings that would support it (cf. *Low v. Golden Eagle Ins. Co.* (2002) 101 Cal.App.4th 1354, 1367–1369 [125 Cal.Rptr.2d 155]) and reject possible contrary findings.

### II. NVP Provision

"California law enforces ... no-voluntary-payments provisions in the absence of economic necessity, insurer breach, or other extraordinary circumstances. [Citations.] They are designed to ensure that responsible insurers that promptly accept a defense tendered by their insureds thereby gain control over the defense and settlement of the claim. That means insureds cannot unilaterally settle a claim before the establishment of the claim against them and the insurer's refusal to defend in a lawsuit to establish liability .... [T]he decision to pay any remediation costs outside the civil action context raises a 'judgment call left solely to the insurer ....' [Citation.] In short, the provision protects against coverage by fait accompli." (*Jamestown Builders, Inc. v. General Star Indemnity Co.* (1999) 77 Cal.App.4th 341, 346 [91 Cal.Rptr.2d 514] (*Jamestown*).)

"[U]nlike a notice provision or a cooperation clause, [an NVP] provision can be enforced without a showing of prejudice: ' "[T]he existence or absence of prejudice to [the insurer] is simply irrelevant to [its] duty to indemnify costs incurred *before* notice. The policy plainly provides that notice is a *condition precedent* to the insured's right to be indemnified; a fortiori the right to be indemnified cannot relate back to payments made or obligations incurred before notice ...." ' " (*Truck Ins. Exchange v. Unigard*

*Ins. Co.* (2000) 79 Cal.App.4th 966, 977 [94 Cal.Rptr.2d 516] *(Truck)*; *Faust v. The Travelers* (9th Cir. 1995) 55 F.3d 471, 472.)

Both parties accept the court's finding that the insured, LSD&D, did breach the NVP provision. Claimants have not cross-appealed to challenge that ruling, evidently secure in their position that they never sought recovery of any pre-tender expenses and that this will not hurt them on a remand for that determination. Nevertheless, they do argue *in another context* (GEIC's no-covered-damages argument) that their settlement was not "voluntary." Out of caution, and because a respondent need not appeal to raise a point of error *defensively* to show that the appellant did not suffered prejudice from any errors it claims (Code Civ. Proc., § 906), we examine the point.

"Voluntariness" was an issue resolved by the court in holding that no exception arose to the general rule that an NVP provision is enforceable without any need for the insurer to show prejudice. We must, of course, approach that holding with deference to all supported findings and inferences. (*In re Executive Life Ins. Co., supra*, 32 Cal.App.4th at p. 358.) The court considered an exception where an insured makes an *involuntarily* payment due to circumstances beyond its control, as where it does not know the insured's identity or the policy contents, or must act immediately to protect its legal interests. (*Jamestown, supra*, 77 Cal.App.4th at p. 348.) The court reasoned that while Stewart "may have been unaware of the Golden Eagle policy, there was no indication Leonard Armato was also unaware of the policy." The finding is supported since neither claimant declared the contrary. Claimants argue on appeal, as they declared below, that: Stewart could not afford a legal defense and Armato advanced her (and other defendants) the funds to hire Owens's firm; he then purchased, repaired and resold the property in order to avoid out-of-pocket settlement costs. It remains, however, that if Armato knew all along that ADI had been insured by Golden Eagle, he could have secured a copy of the policy but was in no hurry to do so. The trial court implicitly so found, adding that claimants "had filed responsive pleadings and otherwise participated" in the lawsuit, the evident point being that they had been able (by Armato advancing funds, or otherwise) to litigate on their own. This, too, supports the finding that LSD&D settled voluntarily, not under compulsion. So does the fact that claimants—after Hartnett's November 18, 1998 letter requesting documents showing an ownership change or restructuring between ADI and LSD&D—proceeded to negotiate a settlement over the next several months (without mention of it to GEIC) rather than supply the documents. Claimants say the ownership change was a matter of public record that GEIC could have discovered "easily," but this claim was unsupported by proof below and even works against them. The court could reasonably conclude that if the records were easily available and claimants badly needed GEIC's help, they could have gotten the information and sent it to GEIC before settling. Finally, the settlement was structured so

that the insured, LSD&D, incurred *no monetary costs*. Deferential review compels rejection of their view that the settlement fell within the involuntary-payment exception to NVP enforcement.

The court also rejected an exception for insurers who deny tender and abandon their insureds, creating an antecedent breach of their coverage obligations and leaving the insureds no choice but to fend for themselves. (*Jamestown, supra,* 77 Cal.App.4th at pp. 347–348.) The court found that this did not occur here because, by the time of settlement, GEIC had accepted the tender as to ADI and had not refused it as to the claimed successor, LSD&D, "at least not initially." Claimants do not seem to dispute the finding, which is amply supported.

GEIC accepts, of course, the court's conclusions about NVP breach and the lack of any applicable exception to enforcement. It contends, however, that the court did not go far enough, legally, when it concluded that the consequence was to relieve GEIC of the duty to reimburse *pre*-tender expenses. GEIC argues that the breach should have relieved it of the duty to reimburse *post*tender expenses as well, including the settlement reached without its knowledge. Case law cited by the court dealt with pre-tender costs but, GEIC urges, should not have been read as limiting relief only to pre-tender costs. Finally, GEIC suggests that since the court (erroneously) ordered relief for pre-tender costs only, its finding of *voluntary payment* may have spoken (erroneously) to pre-tender costs only and thus failed to address voluntariness as to the settlement costs. We agree that there was error in the court's pre-tender expense remedy but disagree with GEIC's reading of the voluntariness ruling's breadth.

This *is* an unusual case in that the NVP breach occurred posttender. "Typically, a breach of that provision occurs, if at all, before the insured has tendered the defense to the insurer" (*Truck, supra,* 79 Cal.App.4th at p. 976), and thus most case authority concerns reimbursement for pre-tender expenses (e.g., *Gribaldo, Jacobs, Jones & Associates v. Agrippina Versicherunges A. G.* (1970) 3 Cal.3d 434, 449 [91 Cal.Rptr. 6, 476 P.2d 406] (*Gribaldo*); *Insua v. Scottsdale Ins. Co.* (2002) 104 Cal.App.4th 737, 745 [129 Cal.Rptr.2d 138]; *Jamestown, supra,* 77 Cal.App.4th at p. 344; *Faust v. The Travelers, supra,* 55 F.3d at p. 472). Ours is therare case where the insured tenders the defense and *then* negotiates a settlement on its own, leaving the insurer in the dark. One could *surmise* that this happened here because counsel was intent on pushing ahead with a global settlement for his many noninsured clients, too, and chose not to await GEIC's decision on tender or whether to approve counsel's representation of the insured. The record does not explain. Anyway, we find no case holding that a *post*tender breach of an NVP provision is unenforceable. ██ Indeed, language from a leading Supreme Court decision indicates that such a provision *is* enforceable posttender until the insurer

wrongfully denies tender. "[I]t is only when the insured has requested *and been denied a defense by the insurer* that the insured may ignore the policy's provisions forbidding the incurring of defense costs without the insurer's prior consent and under the compulsion of that refusal undertake his own defense at the insurer's expense." (*Gribaldo, supra,* 3 Cal.3d at p. 449, italics added; *Jamestown, supra,* 77 Cal.App.4th at pp. 346–347.)

This accords with the policy language here, which says that in the event of a claim or suit, "[n]o insureds will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent." The language, a policy *condition,* does not limit its operation to pre-tender periods.

In ruling that the abandoned-insured exception to enforcement did not apply, the court found that LSD&D had not requested *and been denied* a defense (*Gribaldo, supra,* 3 Cal.3d at p. 449) when it negotiated and executed the settlement without GEIC's knowledge or consent. Accordingly, it was an abuse of discretion not to order that the breach relieved the insurer of posttender costs, too, including the settlement. This also makes unnecessary the court's remand to GEIC to determine which costs were incurred pre- or posttender.

GEIC's concern that the court's involuntary-payment ruling might not have encompassed the settlement costs is refuted by the record. In holding that the case did not come within the abandoned-insured exception (*Jamestown, supra,* 77 Cal.App.4th at pp. 347–348), the court expressly found that GEIC had *not* refused tender as to LSD&D, "at least not initially." This clearly spoke to the *post*tender period, including the months (Dec. 1998 through early Feb. 1999) in which the settlement was negotiated and signed.

### III.   OTHER ISSUES

Our resolution of the NVP issues leaves no reason to consider claimants' attempted attack on the court's findings of notice and cooperation clause breach, or GEIC's attack on the no-substantial-prejudice findings. Nor is there reason to consider GEIC's arguments about lack of covered damages (cf. *County of San Diego v. ACE Property & Casualty Ins. Co.* (2003) 106 Cal.App.4th 349, 357–362 [131 Cal.Rptr.2d 100]) or "standing" for LSD&D.

Claimants renew their argument from below that GEIC is "estopped," by its own delay and inaction, from rejecting the claim. We infer from the court's ruling in favor of GEIC on breach of the NVP provision, however, that the court necessarily and implicitly rejected estoppel. The court rejected much of it in ruling, on the involuntary-payment issue, that LSD&D was not

compelled by GEIC's actions to settle the case. More broadly, the court must have implicitly found no estoppel, or it would have held against GEIC on the NVP provision.

Substantial evidence supports an implied finding of no estoppel. Claimants point to nearly *20 months* of delay between their tender in late October 1998 and GEIC's ultimate denial of indemnity in early June 2000, but this overlooks that claimants had begun settling their case in December and signed a complete agreement by February 1999, less than four months after the tender.   ■   It is *that* period to which any estoppel must arise, for estoppel requires that one party act in detrimental reliance on action by another (*Strong v. County of Santa Cruz* (1975) 15 Cal.3d 720, 725 [125 Cal.Rptr. 896, 543 P.2d 264]). Here, action or inaction by GEIC had to cause claimants to settle alone. The trouble for them is that, during the period in which they were settling the case, GEIC was deciding whether to accept the tender as to the claimed successor in interest (LSD&D), was awaiting requested information on the succession, was told nothing about the negotiations, and was led by claimants' counsel to think that a trial date had been continued. " 'Estoppel applies to prevent a person from asserting a right where his conduct or silence makes it unconscionable for him to assert it' " (*Northwest Airlines, Inc. v. Ontario Aircraft Services, Inc.* (2002) 104 Cal.App.4th 1053, 1060 [129 Cal.Rptr.2d 146]), and the trial court could reasonably find no unconscionability here, in the full circumstances. The court did, in its prejudice analysis for breach of the notice and cooperation clauses, fault GEIC for inattention to the case, but this relative-cause analysis did not compel a finding of estoppel.   ■   On appeal, even points having "arguable merit" do not allow us to overturn a trial court's estoppel findings. (*Billington v. Interinsurance Exchange* (1969) 71 Cal.2d 728, 739 [79 Cal.Rptr. 326, 456 P.2d 982].)

## DISPOSITION

The judgment reversing the decision of GEIC is reversed.

Kline, P. J., and Ruvolo, J., concurred.

Respondents' petition for review by the Supreme Court was denied October 15, 2003. Baxter, J., did not participate therein.