[No. B177474. Second Dist., Div. Four. July 18, 2005.]

JOHN GARAMENDI, as Insurance Commissioner, etc., Plaintiff and Respondent, v.
MISSION INSURANCE COMPANY, Defendant;
INDUSTRIAL TRUCKING SERVICE CORP., Claimant and Appellant.

32

**COUNSEL**

Morgan, Lewis & Bockius, Thomas M. Peterson, Amanda D. Smith, Stanley H. Shure and Richard F. McMenamin for Claimant and Appellant.

Wisener, Nunnally & Gold and Robert H. Nunnally, Jr., for Plaintiff and Respondent.

## OPINION

**CURRY, J.**—Appellant Industrial Trucking Service Corp. (ITSC) appeals from a trial court ruling denying its application for an order to show cause why its claim presented to respondent John Garamendi, Insurance Commissioner of the State of California (Commissioner), should not be allowed in full. ITSC is the successor in interest of an entity insured by Mission Insurance Company (Mission) in 1985 through a second excess policy. As the result of actions of its predecessor in dumping waste on land located in New Jersey, ITSC became embroiled in environmental cleanup litigation. ITSC settled the litigation and then pursued the potentially liable insurers. In the meantime, Mission became insolvent and the Commissioner was appointed its liquidator. The Commissioner, when presented with a claim based on Mission's proportionate share of liability less the liability of the primary and first excess carrier, denied it in part on the ground that there were two occurrences and Mission's liability did not attach until a $1.5 million threshold had been reached for each occurrence. There was language in the policy which created an annual aggregate, but the Commissioner determined it did not apply.

We conclude as a matter of law that the Commissioner misread the policy, and that Mission's liability attached after the primary and first excess carrier paid or became liable to pay a total of $1.5 million, no matter how many occurrences took place in the policy year. We therefore reverse. Because this case came to us after denial of an application for an order to show cause without a show cause order having been issued, and because the Commissioner claims there are matters that remain unsettled such as the right to raise new defenses to ITSC's claim in the trial court, we remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Underlying Facts*

The basic facts are not in dispute. In the 1950's, ITSC's predecessor, Industrial Trucking Service, owned and operated by Rudolph Kraus,[1] hauled waste generated by three separate companies to two parcels of land: one a 12-acre parcel situated one-quarter mile south of New Jersey State Highway 72 and one a 20-acre parcel situated one-eighth mile south of Burlington

---

[1] ITSC stresses that Industrial Trucking Service was a sole proprietorship and that ITSC, the corporation, purchased certain of its assets rather than taking on all its rights and obligations. The Commissioner does not dispute these facts. We use the term "predecessor" as shorthand, and do not mean to imply any other relationship between ITSC and Industrial Trucking Service than that set forth in the briefs.

County Route 532, both located in Woodland Township, New Jersey. Although the precise timing is not clear, the parties are in agreement that Kraus initially deposited waste on the 12-acre parcel and then, when that parcel could no longer be used, began to dump waste on the 20-acre parcel.

Mission provided second-level excess liability coverage to ITSC for one year effective January 1985. The policy stated that coverage was "[i]n the amount of: $5,000,000 excess $1,000,000 excess primary." A primary policy and a first-level excess policy, both issued by Transamerica Insurance Company (Transamerica), covered the same period. The parties agreed that the Transamerica primary policy provided coverage in the amount of $500,000. The Transamerica excess coverage policy provided: "This insurance is excess and the company shall not be liable for amounts in excess of $1,000,000[] for each accident in excess of the underlying limit of $500,000[] for each accident." The Transamerica policy also stated that its limits of liability included $1 million for "Each Occurrence" and $1 million "Annual Aggregate (where applicable)."

Beginning in the 1980's, the three waste generating companies that had done business with ITSC's predecessor found themselves in litigation with the Environmental Protection Agency (EPA) and the New Jersey Department of Environmental Protection over cleanup and response costs for damage to the two parcels. They agreed to perform and pay for the removal and disposal of surface waste materials and contaminated soil, and to perform other remedial action. In 1991, they brought suit against ITSC and its parent, Better Materials Corporation, to recover their costs.[2]

ITSC and Better Materials, in turn, sought defense and indemnity from the insurance companies that had provided liability policies during the period from 1964 to 1985. The insurers rejected the claims, and in 1994, ITSC and Better Materials settled the waste generating companies' suit on their own, agreeing to pay 40 percent of response costs paid or to be incurred in the future.[3] The parties then caused a consent judgment to be entered.

Prior to settlement, ITSC and Better Materials had brought suit in New Jersey District Court against the former insurers. Due to the insolvency of two of the insurers, including Mission, the Pennsylvania Property and Casualty Insurance Guaranty Association (PPCIGA) and New Jersey Property Liability Insurance Guaranty Association were named defendants. The New

---

[2] Better Materials obtained summary judgment. It is not a party to this appeal.

[3] At that point, ITSC's share would have been approximately $20 million. ITSC's claim to the Commissioner alleged that its share had increased to approximately $30 million. In the settlement, plaintiffs agreed not to execute on or recover against any of ITSC's assets "other than against amounts recovered by ITSC as indemnity in the [action against its insurers]."

Jersey court entered partial summary judgment in favor of ITSC and Better Materials, granting judgment in their favor on two affirmative defenses raised by the insurers: (1) that there was no occurrence as defined in the policies which gave rise to coverage and (2) that the pollution exclusion clauses in the policies exclude coverage. ITSC and PPCIGA entered into a partial settlement pertaining to Mission's share of liability which specified that it "in no way release[d] any claims of any kind that ITSC may have against any other persons, including any other . . . liquidators of . . . Mission . . . ." PPCIGA paid $600,000 based on Mission's 1985 second excess policy, the same policy at issue here.

In March 2002, ITSC served a proof of claim on the California Department of Insurance. ITSC allocated $2,412,214 of total damages to Mission. This number was derived from ITSC's liability per its settlement having allegedly reached $30 million at the time the claim was filed. An allocation for each year between 1951 and 1985 was calculated by assigning a percentage risk to each year based on the total amount of insurance coverage—primary and excess—in place during the relevant period.[4] Under this formula, for the year 1985, the allocation for both parcels totaled $3,912,214, approximately 13 percent. Subtracting the $1.5 million provided under the Transamerica primary and first excess policies reduced Mission's share to $2,412,214.

The Commissioner approved only $312,214 of the claim, $2.1 million less than the amount sought. That figure was calculated by subtracting the $1.5 million payable under the Transamerica primary and excess coverage policies twice, once for each parcel, and then deducting the $600,000 paid by

---

[4] To support its allocation methodology, ITSC relied on two New Jersey cases: *Carter-Wallace v. Admiral Ins.* (1998) 154 N.J. 312 [712 A.2d 1116], and *Owens-Illinois, Inc. v. United Insurance Co.* (1994) 138 N.J. 437 [650 A.2d 974]. In *Owens-Illinois*, the New Jersey Supreme Court held that, after the relevant period was determined, damages should be allocated on the basis of insurance policy limits during those years, multiplied by the number of years of coverage. (650 A.2d at p. 993.) For example, if there were nine relevant years and $1 million in insurance in place during each of those years, each year would be allocated or assigned one-ninth of the liability. If, as is more often the case, there was more coverage in the later years, those years would be allocated a greater share. In the present case, the amount of insurance in place per year was relatively low until 1980, when the amount jumped from $2.5 million to $15 million. Therefore, a greater proportion of the damages was allocated to the later years.

In *Carter-Wallace*, the court further held that although the per-year allocation should be determined without regard to the layering of coverage in the relevant years, coverage would be assigned between the primary insurer and the excess policy insurer(s) by depleting each layer of coverage before the next level was pierced. (*Carter-Wallace v. Admiral Ins., supra*, 712 A.2d at p. 1124.) In other words, even though the total potential amount of coverage provided by all insurers—including excess insurers—is taken into account in allocating damages between or among the relevant years, excess insurers may end up paying little or nothing. In the present case, there are apparently third and fourth excess insurers who will not be required to contribute unless allocated damages exceed $6.5 million.

PPCIGA on behalf of Mission. The Commissioner's letter specifically stated: "All bases to support the rejection are reserved, including, but not limited to: [¶] 1. The damages when properly allocated over the years of exposure and number of sites do not support the full claimed amount. [¶] 2. A portion of the claim was previously paid by the [PPCIGA]. [¶] 3. The claim is aggregating two separate hazardous waste sites as one occurrence[.] [¶] All other bases for rejection or reduction of your claim are reserved, including, without limitation, the qualified pollution exclusion contained in the policy, re-allocation of the losses should the Court find a claim, to permit allocation of the losses among all involved policies, the right to credit for any recoveries from other carriers should the Court find a covered claim; the right to demonstrate that the policy claim is overstated, and all other rights granted by the policy, whether express or implied, which are all preserved."

### Proceedings in Trial Court

In October 2003, ITSC filed an application for an order to show cause[5] why its claims should not be allowed in full.[6] ITSC argued that the two parcels of land should be treated as one occurrence because they were "relatively close [in] proximity"; "[t]he Generators' waste was disposed [of] at both locations by Kraus as part of the same ongoing waste disposal operation"; "[b]oth locations were the subject of one contribution action, the Woodland Action"; and "the invoicing of the costs for the remedial effort did not distinguish between the sites."

The Commissioner contended in the opposition to the application for order to show cause that under the purportedly applicable New Jersey law, multiple cleanup sites are treated as multiple losses or occurrences for purposes of insurance coverage. Treating the parcels as two occurrences, in conjunction with the Commissioner's interpretation of certain language in the Mission policy that described when coverage attached, led to the Commissioner's decision to deduct $1.5 million twice. The language at issue stated: "It is expressly agreed that liability shall attach to the Company only after the Underlying Umbrella insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability as follows: $ (as stated in item 3 of the Declarations) ultimate net loss in respect of each occurrence . . . ." Item 3 of the declarations stated: "Underlying Umbrella

---

[5] Insurance Code section 1032 provides that when the Commissioner rejects a claim on an insolvent insurer, "[w]ithin thirty days after the mailing of the notice [of rejection] the claimant may apply to the court in which the liquidation proceeding is pending for an order to show cause why the claim should not be allowed."

[6] In its application, ITSC stated it was not sure what portion, if any, of the $600,000 paid by PPCIGA should be used to reduce its claim. On appeal, it no longer seeks to be reimbursed for this amount.

Limits (Insurance Agreement II): $1,000,000 excess primary." Since primary coverage was $500,000, the Commissioner reasoned that "each occurrence is subject to exhaustion of $1,500,000 of underlying coverage." ITSC, however, had "deducted only one underlying set of coverages, although there are two environmental sites involved." According to the opposition, "[t]his [wa]s inappropriate, and resulted in an overstatement of the claims of the Claimant."

In its reply, ITSC argued that the cleanup involved only one occurrence under the express terms of the policy, the relevant principles of construction of insurance policies, and case law. ITSC further contended that, even assuming there were two occurrences, the Commissioner misinterpreted the policy language defining when Mission's coverage attached, which resulted in an improper double deduction of $1.5 million. In ITSC's view, "the underlying Transamerica Policy had an aggregate limit of liability for property damage claims, and the Mission Policy must respond once this aggregate limit is exhausted." In support, ITSC quoted the following language from the Transamerica excess coverage policy: "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay for damages and expenses, all as more fully defined by the term ultimate net loss, on account of: (i) personal injury, (ii) property damage, (iii) advertising liability, to which this insurance applies caused by an occurrence anywhere." This obligation to pay was restricted by the following provision: "*The limit of the company's liability shall not exceed the amount stated in Item 2(a) of the declarations as a result of any one occurrence. The company's liability shall be further limited to the amount stated in item 2(b) of the declarations in the aggregate for each annual period during the currency of this policy separately in respect of* (1) the products hazard; (2) the completed operations hazard; (3) personal injury by occupational disease sustained by any employees of the insured;[7] (4) the rendering of or the failure to render during the policy period professional services by or on behalf of the named insured; and (5) *insurance afforded under Divisions (ii) and (iii) of paragraph 1 Coverage* [*i.e., property damage* and advertising injury]." Items 2(a) and 2(b) set forth $1 million as the limits of liability for "Each Occurrence" and for the "Annual Aggregate," respectively.

Based on this language, ITSC argued: "[E]ven assuming for argument['s] sake that there are two 'occurrences,' the [annual] aggregate limit of the Transamerica Umbrella Policy is $1 million. Once that amount is applied to the first site, the Transamerica Umbrella Policy limit is exhausted and there is no amount that must be applied to the second site. The same analysis applies

---

[7] The parties, in trying to be less wordy, often refer to this category of injury as "personal injury." A more precise shorthand term would be "occupational injury," which is how we refer to it hereafter.

for the Transamerica Primary Policy. In other words, the Transamerica Primary Policy has a per occurrence and an [annual] aggregate limit of $500,000. Thus, once that amount is allocated to one of the sites, this policy limit is exhausted. Consequently, the limits of the Mission Policy apply immediately to the second parcel because the aggregate limits of the Transamerica Policies are exhausted."

According to ITSC, this was a more reasonable reading of the Mission policy because "otherwise ITSC could exhaust the $1.5 million aggregate limit of the underlying Transamerica Policies for an occurrence (which aggregate limit clearly exists for the reasons discussed above) and then under the Commissioner's reasoning be required to pay $1.5 million out of its own pocket on the next occurrence before reaching the Mission coverage," creating a "coverage gap."

Turning to the language of the Mission policy provision relied on by the Commissioner—"It is expressly agreed that liability shall attach to the Company only after the Underlying Umbrella insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability as follows: $[1 million excess primary] ultimate net loss in respect of each occurrence . . ."—ITSC pointed out that the sentence goes on to say "but $ (as stated in Item 4 of the Declarations [$1 million] in the aggregate for each annual period during the currency of this Policy separately in respect of Products Liability and in respect of [Occupational Injury]. . . ." ITSC argued that, through this language, the Mission policy also recognized that there was a single $1 million excess primary aggregate limit for each annual period during the currency of the policy for all the different types of covered claims, even though the provision only specifically mentioned products liability and occupational injury. As stated in its reply memorandum, "this language does not mean that the aggregate limit in the Transamerica Policies exists *only* for these types of claims. Rather, it means that there is a *separate* aggregate limit for these types of claims."

The trial court ruled in favor of the Commissioner, and denied the application for order to show cause. The court found that the Commissioner's partial rejection of ITSC's application "was neither an abuse of discretion nor an error of law." This appeal followed.

## DISCUSSION

### I

### Occurrence Issue

The Commissioner relied on two factors to reduce ITSC's claim: (1) the conclusion the damage caused to the two parcels in Woodland, New Jersey, by ITSC's predecessor's dumping of waste materials represented two occurrences; and (2) the conclusion that the Mission policy called for its liability for each and every occurrence to attach only after a theoretical $1.5 million had been paid by the underlying insurer toward each occurrence, whether or not the underlying insurer was obligated to pay such amount.

With respect to number of occurrences, the Commissioner cites authority from the field of environmental cleanup: *Caldo Oil Co. v. State Water Resources Control Bd.* (1996) 44 Cal.App.4th 1821 [52 Cal.Rptr.2d 609], *Norfolk Southern Corp. v. California Union Ins. Co.* (2003) 859 So.2d 167, and *Endicott Johnson Corp. v. Liberty Mutual Ins. Co.* (N.D.N.Y. 1996) 928 F.Supp. 176. In *Caldo*, the court held that separate leaking underground storage tanks operated on adjacent parcels by the same company represented two occurrences for purposes of obtaining up to $990,000 "per occurrence" reimbursement from the State Water Resources Control Board for corrective actions undertaken. In *Norfolk Southern Corp.*, *supra*, 859 So.2d 167, a case involving the cleanup of several sites in Louisiana, two of which were contaminated at slightly different times as the result of wood preserving operations, the court held that "a single occurrence took place in each policy period from 1969 to 1972 at the [first] site, and a single occurrence took place in each policy period from 1963 to 1971 at the [other] site." (*Id.* at p. 192.) In *Endicott Johnson Corp.*, *supra*, 928 F.Supp. 176, property damage at the Endicott Landfill site triggered policies issued during the period 1956 to 1970 and property damage at the Tri-Cities Barrel site triggered policies issued during the period 1954 to 1970. The issue before the court was "whether plaintiff's dumping at each waste site constituted one occurrence or multiple occurrences under the legal definition of 'occurrence' in the insurance policies." (*Id.* at p. 180.)

The Commissioner takes the view that these cases stand for the existence of a bright-line rule that in all cases involving cleanup of two or more separate parcels, the damage to each parcel must be deemed a separate occurrence. This overlooks the holdings in the two most pertinent cases— *Norfolk Southern Corp.* and *Endicott Johnson Corp.* The courts' determination in those cases that disposal of similar contaminants on two parcels of land represented two "occurrences" was based in part on the fact that the

conduct took place during different time periods and triggered insurance policies issued during different years. Here, the record indicates that, although Kraus used each property for disposal purposes in different years, the same insurance policies were triggered and cleanup costs were intermingled. Even the EPA, in the reports relied on by the Commissioner to support its two occurrence theory, described the cleanup progress in terms of the *"combined . . . []160,000 tons[] of contaminated waste materials . . . removed from both* the Route 532 and Route 72 sites and disposed of by the potentially responsible parties at an EPA-approved facility."* (Italics added.) Because we conclude that the Commissioner was incorrect in his interpretation of the annual aggregate provision, the number of occurrences is irrelevant at this juncture and we need not resolve the issue now. But should it be revived at a later point, its resolution would require a comprehensive discussion of whether the two sites can realistically be separated given what has transpired in the prior litigation and settlements.

## II

### Annual Aggregate Issue

A. *Standard of Review*

■ The preliminary procedural issue which must be resolved is standard of review, an issue debated at length in the briefs. Both sides agree that interpretation of insurance contract language generally presents a question of law to be reviewed de novo. (See, e.g., *In re First Capital Life Ins. Co.* (1995) 34 Cal.App.4th 1283, 1287 [40 Cal.Rptr.2d 816].) Even where interpretation requires consideration of facts, if the facts are undisputed, the question presented is a legal one. (See, e.g., *State Farm Fire & Casualty Co. v. Elizabeth N.* (1992) 9 Cal.App.4th 1232, 1236 [12 Cal.Rptr.2d 327] ["When . . . an insurance policy interpretation is based on stipulated evidence, the appeal from the judgment presents a question of law that is subject to our independent determination"]; *Royal Globe Ins. Co. v. Whitaker* (1986) 181 Cal.App.3d 532, 536 [226 Cal.Rptr. 435] ["The construction of the policy before us is one of law because it is based on stipulated evidence and the terms of the insurance contract"].) But the Commissioner maintains that the abuse of discretion standard put forth in *Low v. Golden Eagle Ins. Co.* (2003) 110 Cal.App.4th 1532 [2 Cal.Rptr.3d 761] should govern our review in "all aspects of this case."

■ We disagree. In *Low,* a number of factual issues had been resolved by the Commissioner, including whether the insured gave notice of the claim or suit as soon as practicable, whether it cooperated in the investigation,

settlement, or defense of the claim or suit, and whether it made any voluntary payments. As the Court of Appeal noted there, "our review of *factual matters* is highly deferential." (*Low v. Golden Eagle Ins. Co., supra,* 110 Cal.App.4th at p. 1544, italics added.) Courts have expressed a different view when the Commissioner's decision is attacked on purely legal grounds. In *Quackenbush v. Mission Ins. Co.* (1996) 46 Cal.App.4th 458, 466 [54 Cal.Rptr.2d 112], the court stated " '[A]n administrative determination will be interfered with by the courts where the determination is based upon an error in law. [Citation.] It is for the courts, not for administrative agencies, to lay down the governing principles of law. Accordingly, questions of law are reviewable.' " (*Ibid.,* quoting *People ex rel. Fund American Companies v. California Ins. Co.* (1974) 43 Cal.App.3d 423, 431 [117 Cal.Rptr. 623]; accord, *Garamendi v. Golden Eagle Ins. Co.* (2004) 116 Cal.App.4th 694, 703 [10 Cal.Rptr.3d 724].)

Here, with respect to the interpretation of the annual aggregate provision, the Commissioner made a determination based solely on the language of the insurance policy, which was deemed to be plain and unambiguous. Because the issue was resolved without consideration of any facts, it presents legal questions and we review it de novo.

### B. *Choice of Law*

Although both sides seemingly agree that the law of New Jersey (where the land is located) or Pennsylvania (where ITSC did business and where the Mission policy was issued) should be applied, neither side cites controlling authority from those jurisdictions that differs from California law, apparently since none is to be found. "The fact that two or more states are involved does not in itself indicate there is a conflict of laws problem." (*Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 919–920 [103 Cal.Rptr.2d 320, 15 P.3d 1071].) In order to persuade a California court to apply the law of another forum, the proponent of the other forum's laws must invoke the law of the foreign jurisdiction, show that it materially differs from California law, and demonstrate how applying that law will further the interest of the foreign jurisdiction. (*Id.* at p. 919.) Otherwise, a California court will apply its own rules of decision. (*Ibid.*) Since the parties cite no conflicting authority from New Jersey or Pennsylvania, we will apply California law.

### C. *Interpretation of the Annual Aggregate Provision*

The rules governing policy interpretation require us to "look first to the language of the [policy] in order to ascertain its plain meaning." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d

370, 900 P.2d 619].) The plain meaning of policy language is "the meaning a layperson would ordinarily attach to it." (*Ibid.*; see Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2004) ¶ 4:14, p. 4-5, italics omitted ["The test is not what the insurer or its attorneys intended the policy to mean but what a reasonable person in the position of the insured would have understood the words to mean"].) "Although each term must be read in its 'ordinary and popular sense,' it must also be interpreted in context and with regard to its intended function and the structure of the policy as a whole." (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 4:36, p. 4-15, quoting *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 867 [21 Cal.Rptr.2d 691, 855 P.2d 1263].) One of the circumstances that may properly be considered is the existence and coverage limits of other insurance held by the insured. (*Fibreboard Corp. v. Hartford Accident & Indemnity Co.* (1993) 16 Cal.App.4th 492, 498, 509 [20 Cal.Rptr.2d 376] [because insured had separate product liability insurance, provision in a policy applying to claims " 'arising out of premises or operations' " was construed as covering different risks].) ■ When a provision is " 'capable of two or more constructions both of which are reasonable' " it will be deemed ambiguous. (*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co., supra,* at p. 867.)

■ Once it is determined that a provision has no clear and unambiguous meaning, different rules come into play. Ambiguous coverage clauses are to be interpreted to "protect the objectively reasonable expectations of the insured." (*AIU Ins. Co v. Superior Court* (1990) 51 Cal.3d 807, 828 [274 Cal.Rptr. 820, 799 P.2d 1253]; accord, *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1265 [10 Cal.Rptr.2d 538, 833 P.2d 545] (*Bank of the West*).) Courts are urged to "apply a little common sense" to determine which of two or more reasonable interpretations meets the objectively reasonable expectations of the party claiming coverage. (*St. Paul Fire & Marine Ins. Co. v. American Dynasty Surplus Lines Ins. Co.* (2002) 101 Cal.App.4th 1038, 1058 [124 Cal.Rptr.2d 818].)

■ The next rule, which is applied only if neither of the above rules resolves the problem, is to interpret the ambiguous provision against the insurer. (*Bank of the West, supra,* 2 Cal.4th 1254, 1265) Finally, provisions that limit coverage must be " ' "conspicuous, plain and clear" ' " to be enforceable. (*De May v. Interinsurance Exchange* (1995) 32 Cal.App.4th 1133, 1137–1138 [38 Cal.Rptr.2d 581].)

With these rules in mind, we plunge into the actual language of the policy. The Mission policy describes the basic coverage provided as follows: *"The Company hereby agrees,* subject to the limitations, terms and conditions hereinafter mentioned, *to indemnify the Insured for all sums which the*

*Insured shall be obligated to pay* by reason of the liability (a) imposed upon the Insured by law, or (b) assumed under contract or agreement by the Named Insured and/or any officer, director, stockholder, partner or employee of the Named Insured, while acting in his capacity as such, for damages *on account of*: (i) Personal Injuries (ii) *Property Damage*[8] (iii) Advertising Liability, caused by or arising out of each occurrence happening anywhere in the world, and arising out of the hazards covered by and as defined in the Underlying Umbrella Policy(ies) stated in Item 2 of the Declarations and issued by certain Insurance Companies (hereinafter called the 'Underlying Umbrella Insurers')." (Italics added.) "Item 2 of the Declarations" identified Transamerica as the issuer of the Underlying Umbrella Policy.

The Mission policy not only referenced the Transamerica excess policy, it specifically adopted the majority of its terms. Paragraph 2 of the Mission policy states: "This policy is subject to the same terms, definitions, exclusions and conditions (*except as regards the premium, the amount and limits of liability and except as otherwise provided herein*) as are contained in or as may be added to the Underlying Umbrella Policy(ies) stated in Item 2 of the Declarations prior to the happening of an occurrence for which claim is made hereunder." (Italics added.) Further, it was an express condition of the Mission policy "that the Underlying Umbrella Policy(ies) shall be maintained in full effect during the currency hereof without reduction of coverage or limits except for any reduction of the aggregate limits contained therein solely by payment of claims in respect of accidents and/or occurrences occurring during the period of this Policy. Failure of the Named Insured to comply with the foregoing shall not invalidate this policy but in the event of such failures, the Company shall only be liable to the same extent as it would have been had the Named Insured complied with the same condition."

The provision that underlies the current dispute is contained under the heading "Limit of Liability—Underlying Limits" and appears to be an attempt to clarify both the amount of damages or loss that must be incurred before Mission coverage attaches and the upper dollar limit on Mission's liability. As we have seen, this provision begins: "It is expressly agreed that liability shall attach to [Mission] only after the Underlying Umbrella insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability as follows: $ (as stated in Item 3 of the Declarations [1 million excess primary]) ultimate net loss in respect of each occurrence,

---

[8] There is no dispute that the damage to the two parcels caused by the waste dumping falls generally under the coverage provided for property damage. The Commissioner contends on appeal that *if* Pennsylvania or California law were applied to the policy's pollution exclusion clause, coverage would fail. As we have seen, this issue was resolved by the New Jersey court unfavorably to the insurers. (Cf. *Garamendi v. Golden Eagle Ins. Co., supra,* 116 Cal.App.4th 694, 703–717 [discussing Commissioner's ability to collaterally attack the underlying judgment].)

*but $ (as stated in Item 4 of the Declarations [1 million]) in the aggregate for each annual period during the currency of this Policy separately in respect of Products Liability and in respect of [Occupational Injury].*" It goes on to say: "and [Mission] shall then be liable to pay only the excess thereof up to a further $ (as stated in Item 5 of the Declarations [$5 million excess $1 million excess primary]) ultimate net loss in all in respect of each occurrence— *subject to a limit of $ (as stated in Item 6 of the Declarations [5 million]) in the aggregate for each annual period during the currency of this Policy, separately in respect of Products Liability and in respect of [Occupational Injury].*" (Italics added.)

As we have discussed, it was and is the Commissioner's position that the italicized portion of this provision, setting an aggregate annual floor of $1 million excess primary before insurance attaches and an aggregate upper dollar limit on coverage of $5 million, does not apply here because it refers specifically only to products liability and occupational injury claims, and the claim at issue is a real property damage claim. ITSC contends that the italicized language does apply. In its view, the first italicized phrase should not be construed as saying that the underlying aggregate annual amount which, once reached, causes Mission's liability to attach, exists *only* for products liability and occupational injury; but instead should be interpreted to mean that there is a "separate" aggregate annual limit for those types of claims. Under ITSC's interpretation, it is implicit in this provision that Mission's liability attaches as soon as Transamerica's payments for any nonproduct liability/occupational injury types of claims covered by the policy (e.g., property damage, advertising injury, or nonoccupational personal injury), either singly or together, reach a total of $1.5 million within one year. By the same token, under ITSC's theory, the second italicized phrase should be construed as placing a $5 million upper limit on Mission's potential annual liability.

To support its position, the Commissioner relies on the Washington Supreme Court's decision in *Weyerhaeuser v. Comm'l Union Ins.* (2000) 142 Wn.2d 654 [15 P.3d 115], the only case cited by the parties or found by our research where a similar provision in an excess policy has been interpreted. In that case, Commercial Union (CU) had issued a three-year first excess policy insuring Weyerhaeuser for the years 1970 to 1973. The policy "specified limits of $1,500,000 in excess of the . . . $500,000 primary policy limits." (*Id.* at p. 663.) The policy also contained the following provision under the heading "Limit of Liability-Underlying Limits": "It is expressly agreed that liability shall attach to [CU] only after the Underlying Insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability as follows: [¶] $[500,000] ultimate net loss in respect of each occurrence, but [¶] $[500,000] in the aggregate for each annual period during the currency of this Policy separately in respect of Products Liability and

separately in respect of [Occupational Injury] . . . . [A]*nd* [*CU*] *shall then be liable to pay only the excess thereof up to a further* [¶] *$[1,500,000] ultimate net loss in all in respect of each occurrence—subject to a limit of* [¶] *$[1,500,000] in the aggregate for each annual period during the currency of this Policy, separately in respect of Products Liability and separately in respect of [Occupational Injury].*" (*Id.* at p. 666, italics added, bracketed figures inserted by Washington Supreme Court.)

The issue in *Weyerhaeuser* was how this language should be interpreted in the face of claims for the cleanup of dozens of sites, costing millions of dollars. In a motion for partial summary judgment brought by Weyerhaeuser, the trial court had interpreted the italicized portion of the provision as providing no aggregate upper limit for property damage claims or losses, only a per occurrence limit. In other words, the trial court believed that CU had agreed to pay $1.5 million per occurrence for an unlimited number of occurrences—as long as the claims or losses were not the result of products liability or occupational injury. At the same time, the underlying primary coverage policy provided by Fireman's Fund specifically said that, "the aggregate limit of [Fireman's Fund's] liability for all damages shall be $500,000[] as a result of all occurrences or accidents happening during the policy period." (*Weyerhaeuser v. Comm'l Union Ins., supra*, 142 Wn.2d at p. 668.) Because of this language, the trial court applied only a single $500,000 deduction for coverage under the primary policy, leaving CU to shoulder the rest of the monetary burden of up to $1.5 million per occurrence. On appeal, CU sought either a reinterpretation of either the upper limit of its policy or a reinterpretation of when its coverage attached.

On the first issue, CU argued that the italicized language created three annual aggregate limits: "(1) a general aggregate limit for all claims—including property damage—other than products liability and [occupational] injury; (2) an aggregate limit for products liability claims; and (3) an aggregate limit for [occupational] injury claims"—limiting its total exposure to $4.5 million. (*Weyerhaeuser v. Comm'l Union Ins., supra*, 142 Wn.2d at pp. 667–668.) The Supreme Court dismissed that interpretation because the figure $4.5 million was "nowhere expressly reflected in the policy language." (*Id.* at p. 668.) Without further analysis, the court "agree[d] with the trial court that there is no ambiguity in this policy and that if CU had intended to place an aggregate limit on property damage it would have said so. . . . If there are multiple occurrences within an annual period the plain language of this policy does not limit the insured's aggregate recovery for property damage or other types of loss aside from products liability and personal injury." (*Ibid.*)

The court then turned to the issue of when CU's coverage attached. As we have seen, the language of the underlying Fireman's Fund policy clearly

excluded coverage of any amount over $500,000. Therefore, CU asked the court "to examine language from its insurance policy to determine its right to offset the threshold exclusion for which Weyerhaeuser agreed to provide underlying insurance coverage—whether or not [Weyerhaeuser] successfully obtained that coverage." (*Weyerhaeuser v. Comm'l Union Ins., supra*, 142 Wn.2d at pp. 668–669.) Noting that the CU policy language describing when coverage attached was identical to the language that described when coverage ended, CU contended "if [CU] has no aggregate limit for property damage, [Weyerhaeuser]—by virtue of the same language—must be responsible for the first $500,000 of each property damage claim also without aggregate limit." (*Id.* at p. 669.) In other words, "CU argue[d] the underlying aggregate exclusion clause should be given the same meaning as the supplemental aggregate limitation clause, thus entitling it to offset $500,000 against each property damage claim notwithstanding the fact Weyerhaeuser's underlying [Fireman's Fund] policy does in fact impose a $500,000 aggregate limit on coverage to benefit its insured." (*Ibid.*)

The court agreed that "[a] fair, reasonable, and sensible construction" compelled it to agree with CU that the "two clauses of the same policy must have the same meaning." (*Weyerhaeuser v. Comm'l Union Ins., supra*, 142 Wn.2d at p. 670.) "Because the CU aggregate limits clause cannot be read to provide an aggregate property damage limit on CU's liability, the exclusion clause similarly limits CU's liability to that in excess of $500,000 per incident, no matter how many incidents." (*Ibid.*)

Four justices dissented in *Weyerhaeuser*. The dissent began by stating that, "The majority misunderstands the nature of excess liability insurance coverage." (*Weyerhaeuser v. Comm'l Union Ins., supra*, 142 Wn.2d at p. 702 (dis. opn. of Talmadge, J.).) As the dissent explained, "In the ordinary case, excess or umbrella coverages are designed to pick up where the primary insurance coverage leaves off, providing an excess layer of coverage above the limit of the primary policy," and "protect against gaps in coverage." (*Id.* at p. 707.) Objecting to the majority's characterization of the CU policy provision as unambiguous, the dissent insisted that it *was* ambiguous, and that the court "should seek its meaning by referring to the commercial context in which the policy was sought, written, and purchased" and give the provision a " 'commercially reasonable construction.' " (*Id.* at p. 706.) Under the facts presented, the CU policy "was simply one portion of the insurance program Weyerhaeuser negotiated and purchased." (*Id.* at p. 706, fn. 24.) Because Weyerhaeuser deliberately placed insurance coverage in layers above the CU policy, "[i]t would be absurd . . . to construe the [CU] policy to provide unlimited property damage coverage." (*Id.* at p. 707.) "If in fact the [CU] policy provided unlimited property damage coverage, there would have been no need for Weyerhaeuser to purchase yet another layer of coverage for property damage." (*Id.* at p. 708.)

Based on these factors, the dissent concluded that the CU policy "provided an aggregate annual limit of liability insurance coverage to Weyerhaeuser in the amount of $1,500,000 for the property damage coverage." (*Weyerhaeuser v. Comm'l Union Ins., supra*, 142 Wn.2d at p. 709.) This interpretation was consistent with "the language of the [CU] policy[,] its declaration page[,] [and] the context of Weyerhaeuser's placement of excess liability insurance coverage, given [CU's] place in the layers of coverage afforded to Weyerhaeuser." (*Ibid.*)

After reviewing *Weyerhaeuser*, we believe the views expressed by the dissent are more in line with California law. On the question of ambiguity, the provision at issue strikes us as not just ambiguous, but nearly incoherent. While there might be some point to having a provision limiting coverage on an annual basis in a multiyear policy, such as was at issue in *Weyerhaeuser*, the Mission policy before us was for one year and states on its face that it is in the amount of "$5,000,000 excess $1,000,000 excess primary [$500,000]." Without another word being said, this would seem to give the policy a "floor" of $1 million excess primary and a "ceiling" of $5 million. Therefore, the provision at issue is either surplusage—unlikely and not argued by anyone— or, instead of "limit[ing] . . . liability" as the heading suggests is its intent, works to *expand* Mission's potential liability. If we accept the *Weyerhaeuser* majority interpretation, advocated by the Commissioner, the provision would create separate $5 million aggregate limits for products liability and occupational injury—$10 million total—plus *unlimited* coverage for any other type of claim that fits within the policy, subject only to a $5 million per occurrence limit. If we accept the *Weyerhaeuser* dissent interpretation, advocated by ITSC, the provision creates separate $5 million aggregate limits for (1) products liability, (2) occupational injury, and (3) all other types of claims that fall under the policy's coverage combined—a potential total of $15 million if all three categories reached their maximum during the policy year. Without looking any deeper, the latter interpretation seems more reasonable—or at least less wholly irrational. Focusing on other factors, the superiority of that interpretation becomes even more evident.

First, we note that the Mission policy was issued after the Transamerica policies; specifically refers to the Transamerica policies; states that it is subject to the same terms, definitions, exclusions, and conditions as the Transamerica first excess policy except as specifically otherwise provided; and demands as a condition of coverage that the Transamerica first excess policy be "maintained in full effect." Focusing again on the language of the disputed provision—"It is expressly agreed that liability shall attach to [Mission] *only after the Underlying Umbrella insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability as follows*: $[1 million excess primary] ultimate net loss in respect of each occurrence, but $[1 million] in the aggregate for each annual period

during the currency of this Policy separately in respect of Products Liability and in respect of [Occupational Injury]"—the italicized portion suggests that what follows is a description of Transamerica's liability under the referenced policy. But if we accept the "plain meaning" ascribed to the provision by the Commissioner, the language that follows is not a simple restatement of Transamerica's liability, but an oblique demand that the insured obtain a completely different first excess policy with completely different terms. Indeed, if we read the italicized phrase literally *and* accept the Commissioner's interpretation of the annual aggregate language that follows, Mission's liability would not arise *unless* the insured obtained a first excess policy requiring the first excess insurer to pay $1 million per occurrence without limit and the first excess insurer either paid or was held liable to pay that amount. The italicized phrase literally says that Mission's liability will attach "only after" Transamerica has paid or been held liable to pay the liability described in the second half of the provision. As the parties concede, Transamerica will never pay or be held liable for an unlimited number of $1 million over primary payments per occurrence.[9]

■ Second, this is a form provision in a form policy, and must be assumed to have been in general use by Mission at the time.[10] Excess coverage has generally been interpreted to mean " 'insurance that begins after a predetermined amount of underlying coverage is exhausted . . . .' " (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 8:76, p. 8-39, quoting *Wells Fargo Bank v. California Ins. Guarantee Assn.* (1995) 38 Cal.App.4th 936, 940 [45 Cal.Rptr.2d 537].) But if the *Weyerhaeuser* majority and the Commissioner are correct, then many of Mission's insureds procured excess insurance policies that, contrary to the generally accepted definition of excess coverage, did not begin where the underlying coverage left off. Instead, huge gaps in coverage existed whenever a single occurrence or series of occurrences exhausted the underlying policies and another claim arose. As the dissent stated in *Weyerhaeuser*, "In the ordinary case, excess or umbrella coverages are designed to pick up where the primary insurance coverage leaves off, providing an excess layer of coverage above the limit of the primary policy," and "protect against gaps in coverage." (*Weyerhaeuser v. Comm'l Union Ins., supra*, 142 Wn.2d at p. 707.)

The Commissioner asks us to interpret an ambiguous provision in a way that creates an anomalous and atypical excess policy. More significantly, it asks that we do so in the face of clear California authority that policy

---

[9] At oral argument, counsel for the Commissioner in fact argued that the insured breached the policy by not getting a first excess policy in line with its interpretation of the disputed provision, but that the Commissioner would overlook that breach and pay the portion of each claim that exceeded $1.5 million.

[10] It was very similar to the form used in *Weyerhaueser* and, therefore, may have been more widely used.

language is to be interpreted to protect the objectively reasonable expectations of the insured and exclusions must be conspicuous, plain, and clear. ITSC, on the other hand, asks merely that we harmonize the language of the Mission and Transamerica excess policies so that once Transamerica pays or becomes liable to pay $1 million excess primary "in the aggregate for each annual period during the currency of this policy . . . in respect of . . . (5) [property damage]," the Mission policy attaches. This requires that we do nothing more difficult than conclude that the word "separately" preceding the phrase "in respect of Products Liability and [Occupational Injury]" in the Mission policy does not mean "only" and that the failure to specifically mention property damage in that phrase does not, by negative implication, mean there is no annual aggregate floor for property damage, but instead means there is no "separate" aggregate.

Finally, as hard as it is to conceive that the insured would agree to an excess policy that left unlimited million dollar gaps in coverage, it is even harder to imagine that Mission would design a policy under which it could be liable for up to $5 million per claim or occurrence for an unlimited number of occurrences. We agree with the majority in *Weyerhauser* that, whichever interpretation of the disputed provision is chosen, it must be the same for both the "floor" and the "ceiling," since the words used to describe both are virtually identical. This means that if there is no annual aggregate for one, there can be no annual aggregate for the other. The dissent in *Weyerhauser* wondered why the insured company would have other excess coverage for property damage if its first excess policy was infinite. The answer is that, even under the majority's interpretation, there was a per occurrence limit. We believe the more pertinent question is how an insurer can operate an insurance business and calculate premiums that lead to a profitable enterprise when it has no notion what its upper liability limit will be.

In short, we believe that the interpretation of the provision supported by the dissent in *Weyerhaeuser* and ITSC is more reasonable than an interpretation which would (1) ignore the obvious implications of the phrase specifying that Mission's liability would attach "only after [Transamerica] ha[s] paid or ha[s] been held liable to pay the full amount of their respective ultimate net loss liability as follows"; (2) create unlimited per occurrence gaps in coverage for all types of covered injuries other than product liability and occupational injury; and (3) create unlimited per occurrence liability for all covered injuries other than product liability and occupational injury. By contrast, the interpretation advocated by ITSC requires only that we read the language in harmony with the existing Transamerica primary and first excess policies, and in a way that comports with the accepted understanding of excess coverage. We endorse ITSC's interpretation.

## III

### Proceedings After Remand

Although we agree with ITSC on its interpretation of the annual aggregate language, we do not concur with the ultimate conclusion in its brief that this matter should be remanded with instructions to the trial court to order the Commissioner to approve an additional $1.5 million of ITSC's claim. Our holding may well result in such additional recovery when all is said and done. But ITSC was seeking issuance of an order requiring the Commissioner to show cause as to why its claims should not be allowed in full. Its application was denied, and the Commissioner was never formally ordered to appear before the court and present reasons why its calculations were correct. (See *Cedars-Sinai Imaging Medical Group v. Superior Court* (2000) 83 Cal.App.4th 1281, 1286 [100 Cal.Rptr.2d 320] ["The order to show cause acts as a summons to appear in court on a certain day and, as its name suggests, to show cause why a certain thing should not be done"].) The Commissioner gave specific reasons for reducing the claim, but stated in its letter that "[a]ll other bases for rejection or reduction of [the] claim are reserved, including, without limitation, the qualified pollution exclusion contained in the policy, re-allocation of the losses should the Court find a claim, to permit allocation of the losses among all involved policies, the right to credit for any recoveries from other carriers should the Court find a covered claim; the right to demonstrate that the policy claim is overstated, and all other rights granted by the policy, whether express or implied, which are all preserved." Whether the Commissioner may raise defenses already resolved by the underlying litigation against the insolvent insurer or whether he may raise issues in court not relied on as a basis for rejection or reduction of the insured's claim, and what these defenses or issues might be, has not been briefed.[11] The parties should have an opportunity to present their views to the trial court concerning these matters.

If the trial court determines that the Commissioner does have the right to raise new defenses or issues, the new matters should be addressed through the order to show cause procedure of Insurance Code section 1032. If it

---

[11] As we have seen, the Commissioner contended in his brief that the pollution exclusion clause in the policy might well have foreclosed recovery if Pennsylvania or California law were applied, but at the same time argued for the applicability of New Jersey law. In its reply ITSC protested that the Commissioner's failure to raise this below meant that ITSC "had no reason, and no opportunity, to develop and present evidence showing that the exclusion is inapplicable." It did not argue that the Commissioner was or should be estopped to assert this defense in the trial court should the matter be remanded.

concludes that the Commissioner is estopped or otherwise precluded, then it should issue the order requested by ITSC requiring the Commissioner to pay an additional $1.5 million.

## DISPOSITION

The matter is reversed and remanded for further proceedings in accordance with the views expressed in this opinion. ITSC is awarded costs on appeal.

Hastings, Acting P. J., and Willhite, J., concurred.

A petition for a rehearing was denied August 17, 2005.