[No. G021620. Fourth Dist., Div. Three. Nov. 29, 1999.]

JAMESTOWN BUILDERS, INC., et al., Plaintiffs and Appellants, v.
GENERAL STAR INDEMNITY COMPANY, Defendant and Respondent.

## COUNSEL

Parilla, Militzok & Shedden, Paul H. Parilla and Marc Ettinger for Plaintiffs and Appellants.

Quisenberry & Barbanel, Alan H. Barbanel, Stephen D. Treuer and Ora D. Kramer for Defendant and Respondent.

## OPINION

**CROSBY, Acting P. J.**—Here we apply a no-voluntary-payments provision to preclude insurance coverage for repair expenses voluntarily incurred by a

home developer. The developer neither notified the insurer nor sought its consent before presenting it with the fait accompli of completed settlements. Because there was no antecedent breach of any duty to defend and because this is not a late notice claim involving an ongoing lawsuit, the rule requiring a showing of prejudice does not apply.

I

Plaintiffs Jamestown Builders, Inc., and A-M Homes (collectively Jamestown) developed the 300-home Saltaire and Sonterra housing tracts in Laguna Niguel during the mid-1980's. Jamestown obtained a comprehensive general liability policy from defendant General Star Indemnity Company for a one-year period from November 1986 to November 1987. The Sonterra project was completed in November 1987 and the Saltaire shortly afterward, in June 1988.

Many of the new homeowners were dissatisfied with the construction, complaining the houses were not watertight. These complaints began as a trickle in the late 1980's, but intensified in the early 1990's as more homeowners demanded that Jamestown fix the problems and compensate them for damages. Jamestown was faced with a "deluge of problems."

Jamestown paid approximately $1,240,000 for repairs and damages from June 1991 to June 1993. It investigated and repaired all known water intrusion related problems arising from these developments, and no lawsuits were filed against it.

The developer never tendered any of these damage claims to General Star during this period. (We are not told whether Jamestown made any claims on other liability carriers or received other contributions to the settlements.) Thus, Jamestown incurred these expenses before General Star had notice of the repairs or the underlying problems.[1]

Jamestown gave two reasons for not notifying General Star. First, it was inordinately preoccupied with the magnitude of the remedial work. As its counsel explained during oral argument below, "Did our client go forth and get the consent required and ask to incur these costs from General Star? I don't believe they did. And we think we have at least provided an explanation they were in the midst of going through and repairing God knows how

---

[1]Jamestown did file a construction defect lawsuit in 1993 against some 21 subcontractors, alleging they improperly framed and flashed the windows and sliding glass doors, applied the roofing materials, the lath and plaster, installed the sheet metal, and constructed the pot shelves without enough pitch to allow water to run off and away from the homes.

many homes because of all the problems that we had." Second, Jamestown never imagined that a 1987 policy would cover expenses paid in 1993. Jamestown specifically pleaded that compliance with the no-voluntary-payments provision was excused because of its "erroneous belief that the . . . [p]olicy would not provide coverage because of the time which passed between the stated expiration date . . . (November 15, 1987) and the dates of the water intrusion repairs and the exigent circumstances caused by the water intrusion problems."[2]

Jamestown first requested reimbursement from General Star in February 1994. In May 1994, General Star denied the claim based on the no-voluntary-payments provision in the policy.

During 1994 and 1995, Jamestown received complaints from homeowners regarding new incidents of intruding water into their houses "all as a result of the damage caused by the rainstorms from the previous winter." Jamestown thereupon paid an additional $222,000 in loss expenses to repair these problems. It did not obtain General Star's permission before making these payments.

Jamestown filed the instant lawsuit for breach of insurance contract and bad faith in May 1996, attaching the policy as an exhibit. The original complaint only sought damages arising from General Star's refusal to indemnify for the initial $1,240,000 payments, not the subsequent $222,000 payments in 1995. Twice the court sustained General Star's demurrers with leave to amend to "give [Jamestown] one more bite at the apple."

Jamestown filed its second amended complaint, the operative pleading, in February 1997. The amended pleading raised both payments, but still failed to plead Jamestown complied with the no-voluntary-payments provision or was excused from compliance. After a hearing the court sustained the demurrer without leave to amend.

## II

██  The no-voluntary-payment provision provides, "Should any claim or suit to which this policy applies appear likely to exceed the Retained Limit [of $50,000 each occurrence and $2 million aggregate], no loss expenses or legal expenses shall be incurred on behalf of the company

---

[2]As its counsel candidly conceded during argument below, "[I] don't think they were concentrating on whether or not they believed that there was going to be any coverage under a policy that expired many years ago. That wasn't their focus."

without its prior consent." Another clause in the same endorsement gives General Star the option to "assume charge of the defense and/or settlement" of claims against Jamestown for which coverage is sought. It states, "The Company shall have the right to assume charge of the defense and/or settlement of any claim or suit brought against the insured and, upon written request from the company, the insured shall tender such portion of the self-insured retention as the company may deem necessary to complete the settlement of such claim or suit."[3]

■ California law enforces such no-voluntary-payments provisions in the absence of economic necessity, insurer breach, or other extraordinary circumstances. (*Gribaldo, Jacobs, Jones & Associates v. Agrippina Versicherunges A.G.* (1970) 3 Cal.3d 434, 449 [91 Cal.Rptr. 6, 476 P.2d 406] (*Gribaldo*); see also *Faust v. The Travelers* (9th Cir. 1995) 55 F.3d 471, 472 ["California courts have consistently honored [no-]voluntary payment provisions"].) They are designed to ensure that responsible insurers that promptly accept a defense tendered by their insureds thereby gain control over the defense and settlement of the claim. That means insureds cannot unilaterally settle a claim before the establishment of the claim against them and the insurer's refusal to defend in a lawsuit to establish liability. As the Supreme Court has recognized, the decision to pay any remediation costs outside the civil action context raises a "judgment call left solely to the insurer . . . ." (*Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 883 [77. Cal.Rptr.2d 107, 959 P.2d 265] [no duty to pay prophylactic expenses incurred by insured in conjunction with administrative remediation order even though "early intervention in a dispute outside the civil action context may reduce any indemnity for which the insurer is ultimately held liable"].) In short, the provision protects against coverage by fait accompli.

In *Gribaldo* the policy condition prohibited the insured from admitting any liability, settling any claim, or incurring any expenses or costs in connection with a claim "without the written consent of the Underwriters, who shall be entitled at any time to take over and conduct in the name of the Assured the defense of any claim." (*Gribaldo, supra,* 3 Cal.3d at p. 441.) Precisely because the clause was intended to "invest the insurer with *complete control and direction* of the defense or compromise of suits or claims" (*id.* at p. 449), the Supreme Court recognized only a limited exception: "[I]t is only when the insured has requested and been denied a defense by the insurer that the

---

[3]This policy language belies Jamestown's argument that the clauses are limited to pre-tender defense costs, not settlements. The policy speaks about both "legal expenses" *and* "loss expenses," giving General Star the option to control both defense and settlement of claims or suits for which there is the potential of coverage.

insured may ignore the policy's provisions forbidding the incurring of defense costs without the insurer's prior consent, and under the compulsion of that refusal undertake his own defense at the insurer's expense." (*Ibid.*, italics added.)

In *Safeco Ins. Co. v. Superior Court* (1999) 71 Cal.App.4th 782 [84 Cal.Rptr.2d 43], the court held a liability insurer was not obligated to indemnify its insured for a settlement reached by its independent *Cumis* (*San Diego Federal Credit Union v. Cumis Ins. Society, Inc.* (1984) 162 Cal.App.3d 358 [208 Cal.Rptr. 494, 50 A.L.R. 4th 913]) counsel with a third party claimant. The settlement was reached without the insurer's consent. Like here, there was no contention in *Safeco* that the insurer breached its duty to defend the insured. (To the contrary, the insurer had agreed to provide a defense.) Under these circumstances, the *Safeco* court applied the no-voluntary-payments provisions in the policy and declined to allow the insured, either unilaterally or through *Cumis* counsel, to usurp the insurer's contractual right to control the settlement. The court explained, "In the present case, Safeco indisputably provided a defense and, accordingly, had the right to control that defense and to decide on its own whether or not to settle. The [insureds] had no authority to settle the matter without the consent of Safeco; the stipulated judgment between the [claimants] and the [insureds] is unenforceable against Safeco." (71 Cal.App.4th at p. 787.)

In like fashion, *Finkelstein v. 20th Century Ins. Co.* (1992) 11 Cal.App.4th 926 [14 Cal.Rptr.2d 305] held an insurer had no duty to indemnify a drunk driver who gave $6,700 to an accident victim as "conscience money." He explained that "[b]eing a sober member of Alcoholics Anonymous, I felt it mandatory that I make—not that I make, but that restitution be made to the victims. And as it dragged on and on and on, I couldn't really get past that part of my A.A. program." (*Id.* at p. 929.) However commendable, the payment did not trigger the insurer's indemnity obligation. Citing the no-voluntary-payments provision, the court tersely observed, "It appears from appellant's deposition testimony that he voluntarily offered his own $6,700 to secure a settlement not because of duress from the insurer, but rather because of his own conscience and his personal motivation of assisting in his alcoholic rehabilitation." (*Id.* at p. 930.)

■ There are numerous circumstances in which a no-voluntary-payments provision may be deemed inapplicable or where disputed issues of material fact prevent resolution short of trial. First, insurers that decline a tendered defense are out of luck. An insured that has been abandoned by its carrier and left exposed to the possibility of a default judgment may protect

its own interests by entering into a reasonable settlement without losing its right to recover on the policy. (See, e.g., *Isaacson v. California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775, 791 [244 Cal.Rptr. 655, 750 P.2d 297]; *Pruyn v. Agricultural Ins. Co.* (1995) 36 Cal.App.4th 500, 515 [42 Cal.Rptr.2d 295].) The no-voluntary-payments provision is superseded by an insurer's antecedent breach of its coverage obligation. And the burden of proof shifts to the insurer to show that the settlement was not reasonable or was the product of fraud or collusion. *(Safeco Ins. Co. v. Superior Court, supra,* 71 Cal.App.4th at p. 790, fn. 5.)

General Star did not turn down any tender of a defense, nor did it disclaim coverage responsibilities once notified of the claims. It took no action to prevent Jamestown from promptly tendering its claim, and there is no basis for findings of waiver, detrimental reliance, or insurer misconduct or nonperformance. *(Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31-32 [44 Cal.Rptr.2d 370, 900 P.2d 619].) This is "not a case in which the insurer had breached its duty to defend, in addition to failing to settle." *(Camelot by the Bay Condominium Owners' Assn. v. Scottsdale Ins. Co.* (1994) 27 Cal.App.4th 33, 50 [32 Cal.Rptr.2d 354].)

Second, an insured may be able to avoid application of a no-voluntary-payments provision where the previous payments were made involuntarily because of circumstances beyond its control. This situation might occur where the insured is unaware of the identity of the insurer or the contents of the policy. *(Shell Oil Co. v. National Union Fire Ins. Co.* (1996) 44 Cal.App.4th 1633, 1649 [52 Cal.Rptr.2d 580].) Or the insured may be faced with a situation requiring immediate response to protect its legal interests. *(Fiorito v. Superior Court* (1990) 226 Cal.App.3d 433 [277 Cal.Rptr. 27] [insureds permitted to try to prove they involuntarily incurred pre-tender defense costs in order to respond to lawsuit and avoid default].)

Despite having three opportunities to do so, Jamestown failed to plead that the $1,240,000 paid to the homeowners was *in*voluntarily made. Jamestown, a large-scale developer of tract homes, knew of the General Star policy and of the homeowners' complaints regarding the water intrusion that were made shortly after the policy was terminated. But Jamestown did not begin making any payments for at least three years (until June 1991), and it took more than two years (until July 1993) for the full $1,240,000 to be expended.

On its face the complaint shows that Jamestown had ample time to review the policy, investigate the claims, and tender them to General Star. Neither

time nor events stopped Jamestown from tendering its defense to General Star before spending some $1,240,000 in settlements. (*Foster-Gardner, Inc. v. National Union Fire Ins. Co., supra,* 18 Cal.4th at p. 886 ["[S]ite investigation expenses incurred prior to the instigation of a lawsuit against the insured are not defense costs the insurer must incur. That is because the insurer does not yet have a duty to defend the insured."].)

Instead, as we have noted, Jamestown pleads that it never made a tender because of its "erroneous [legal] belief" that it could not claim coverage from General Star because its policy had expired. This does not suffice to excuse Jamestown's obligation to make a tender if there was any potential basis for coverage.

Given its knowledge of the claims and the policy terms and conditions and the lack of any blameworthy conduct by General Star, Jamestown should have found the facts. It could not wait for the facts to find it. (*Chase v. Blue Cross of California* (1996) 42 Cal.App.4th 1142, 1154 [50 Cal.Rptr.2d 178] ["The principle that both parties are bound by the terms of the contract, even though one of them may misunderstand its terms, has substantial precedent."].) Jamestown's ignorance of its policy rights does not extend the time in which it was required to take action. (*Id.* at p. 1156.)[4]

Jamestown strenuously argues that General Star cannot rely upon the no-voluntary-payments provision unless it shows prejudice, which it cannot do on demurrer. Jamestown's cases are inapposite. They all deal with situations in which an insurer attempted to invoke a notice or cooperation clause to compel the insured to forfeit its right to a defense and indemnity in pending actions. (See, e.g., *Xebec Development Partners, Ltd.* v. *National Union Fire Ins. Co.* (1993) 12 Cal.App.4th 501, 533 [15 Cal.Rptr.2d 726] ["The insurer's burden 'is not carried by a showing of possibility of prejudice to the insurer. Rather, actual prejudice must be shown. [Citation.] The insurer "must establish at the very least that if the cooperation clause had not been breached there was a substantial likelihood the trier of fact would have found in the insured's favor." ' "].)

---

[4]Jamestown claims there is a triable issue of fact because "it was under a legal obligation to make those repairs. If it had chosen to simply ignore the complaints of these homeowners, it most certainly would have been a defendant in multiple lawsuits, which would have driven up the costs to the insured and to its insurance carriers. Through its accountability and responsibility, Jamestown saved countless hours, tremendous sums of money and judicial resources."

Jamestown, however, ignores another option: It could have tendered the matter to General Star, thereby allowing the insurer to negotiate with the homeowners, involve other insurance carriers or involve the subcontractors and their insurance carriers.

As explained in *Faust v. The Travelers, supra,* 55 F.3d at pages 472-473, "[the insured] does not cite any California authority, and this court is aware of none, that imposes a prejudice requirement for enforcement of the provision. [The insured] notes, however, that California courts have required a showing of prejudice before an insurer will be allowed to avoid liability on the basis of the insured's breach of a *notice* or *cooperation* clause in a policy. [Citations.] [¶] . . . [I]n each case, enforcement of the provision in question would have worked a forfeiture of the insured's rights under the policy. The voluntary payment provision, by contrast, provides only that an insurer will not be held liable for expenses voluntarily incurred by an insured before tendering defense of a suit to the insurer. Travelers does not—and did not—argue that it had no duty to perform because of [the insured's] tardy tender."

Jamestown wrongly assumes that the no-voluntary-payments provision, "[c]arried to its extreme and illogical conclusion," voids *all* liability coverage once a developer voluntarily incurs repair expenses without insurer notification or consent. Jamestown paints a bleak picture of insurers that would use the provision to walk away from coverage responsibilities in ongoing disputes where the developer has provided notice to its insurer before commencing new repairs. No court, to our knowledge, has so construed the no-voluntary-payments provision. Only *previous* voluntary payments by the insured are barred from indemnification.

Indeed, that is why even the *Xebec* court barred the insured from recovering defense costs incurred before the insurer was given notice of the claim. As to such pre-tender expenses, *Xebec* applied the no-voluntary-payments provision regardless of any showing of prejudice: "[T]he existence or absence of prejudice to National Union is simply irrelevant to National Union's duty to indemnify costs incurred *before* notice. The policy plainly provides that notice is a *condition precedent* to the insured's right to be indemnified; a fortiori the right to be indemnified cannot relate back to payments made or obligations incurred before notice. . . . The prejudice requirement, discussed in detail above, applies only to the insurer's attempt to assert lack of notice as a *policy defense* against payment even of losses and costs incurred *after* belated notice." (*Xebec Development Partners, Ltd.* v. *National Union Fire Ins. Co., supra,* 12 Cal.App.4th at p. 566.)

In this regard we agree with Jamestown that the no-voluntary-payments provision cannot be construed as a total forfeiture to deny an insured's unsatisfied obligations.

## III

Jamestown also seeks indemnity for $222,000 in repair costs and damages it paid to the homeowners in 1995. (The parties call these costs the "post-tender expenses" because they were incurred by Jamestown *after* it notified General Star of the claims.)

Jamestown concedes it settled without General Star's consent. But Jamestown contends, "giving notice and trying to obtain consent would have been futile" because General Star had denied coverage for the earlier $1,240,000 settlement. Jamestown apparently believes General Star can only raise the no-voluntary-payments provision once, and that having been raised, it thereafter is waived or somehow used up. Jamestown argues, "[B]ecause General Star denied coverage for Jamestown's claims on at least two occasions, Jamestown did not need General Star's consent before incurring the 1995 repair expenses."

We are mystified by this logic. As we have noted, the no-voluntary-payments provision does not result in a forfeiture of the policy, but only affects voluntarily incurred costs already made by the insured. If anything, General Star's invocation of the no-voluntary-payments provision for the $1,240,000 should have put Jamestown on clear notice to tender any unsatisfied damage to General Star before attempting yet another unilateral settlement. There is nothing in the record to suggest that General Star was attempting to use the no-voluntary-payments provision to repudiate the policy in its entirety or to prevent or discourage Jamestown from tendering previously unknown damage claims. Neither the policy nor the law requires General Star to indemnify Jamestown for the $222,000 settlement. (*Safeco Ins. Co.* v. *Superior* Court, *supra,* 71 Cal.App.4th 782; *Finkelstein v. 20th Century Ins. Co., supra,* 11 Cal.App.4th 926.) We need not consider the impact of Jamestown's apparent concession that the underlying damage resulted from the rainstorms the previous winter, long after the General Star policy had expired.

The judgment is affirmed. General Star shall have costs on appeal.

Rylaarsdam, J., and Bedsworth, J., concurred.