**PIVEG, INC., Plaintiff,**

v.

**GENERAL STAR INDEMNITY COMPANY, Defendant.**

**Case No.: 15CV981-DMS (JLB)**

United States District Court, S.D. California.

Signed June 20, 2016

John C. Gugliotta, Law Offices of Gugliotta & Associates, Irvine, CA, for Plaintiff.

Alan H. Barbanel, Barbanel and Treuer, Paul Andrew Impellezzeri, Barbanel & Treuer, P.C., Los Angeles, CA, for Defendant.

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Honorable Dana M. Sabraw, United States District Judge

Defendant General Star Indemnity Company ("General Star") moves for summary judgment on grounds that it has no duty to indemnify Plaintiff Piveg, Inc. ("Piveg") for damages arising out of a third party claim. Piveg filed an opposition, and General Star filed a reply. After reviewing the record and the parties' arguments, the Court concludes the undisputed facts establish that Piveg voluntarily resolved the third party claim without notice to General Star, thereby depriving General Star of its ability to control any defense or settlement of the claim. The insurance policy issued to Piveg precludes such conduct and relieves General Star of its obligations under the Policy for payments voluntarily made and obligations voluntarily assumed by its insured. For reasons more fully set out below, the motion for summary judgment is granted.

### I.

### BACKGROUND

Piveg is a supplier of raw materials to vitamin manufacturers. The raw materials sold by Piveg are incorporated into retail supplements by the vitamin manufacturers. J&D Laboratories, Inc. ("J&D"), a vitamin manufacturer, ordered 700 kg of astaxanthin oil from Piveg at a cost of $454,989. Astaxanthin oil is a supplement with purported health benefits that can be manufactured from either algal ("natural") or petrochemical ("synthetic") sources. J&D incorporated the astaxanthin oil it purchased from Piveg into 2 million softgels to satisfy a purchase order from its client, NOW Foods, Inc. ("NOW"), a retail supplement brand. After testing the softgels, NOW rejected them, asserting they were manufactured from synthetic, rather than natural sources. NOW's purchase price, had it not rejected the softgels, was $577,675.70.

After NOW rejected the softgels, J&D demanded from Piveg "immediate and full reimbursement[.]" Piveg offered to pay J&D $577,675.70 to purchase the softgels, at $50,000 per month, in addition to other consideration. Pl.'s Mot., Ex. 6 (email from Michael Keefe Chief Financial Officer of J&D to Roberto Espinosa Chief Executive Officer of Piveg). On September 4, 2014, J&D countered Piveg's offer, requesting repayment at $65,000 per month, interest-free. In response, Espinosa wrote to Keefe, stating: "Please give me until tomorrow as it looks like there is another very good alternative." Id., Ex. 7. In that email, he also requested samples of J&D's softgels. Thereafter, Espinosa personally

picked up samples of the softgels and had them tested by a lab. *Id.*, Ex. 16.

Over the next two weeks, Espinosa requested multiple in-person meetings "about how to get [J&D] paid in cash within 30 to 60 days." *Id.*, Ex. 17. Keefe met with Espinosa as requested, and in the meeting Espinosa claimed that the lab results revealed the softgels had "100's of times the allowed maximum for antioxidants (BHA and BHT) that should not be there to begin with." *Id.*, Ex. 12. Espinosa claimed that because of the contamination, he could file an insurance claim for property damage and reimburse J&D. *Id.*, Ex. 17. Espinosa requested a letter from J&D to corroborate Piveg's insurance claim, and he indicated that the insurance company would pay J&D within 30 to 60 days. *Id.* J&D, however, was unwilling to rely on Espinosa's testing and insisted on a "more reputable lab." *Id.*, Ex. 12. After reviewing the results from the lab selected by J&D, J&D's director of quality control stated in an email: "Our results on the astaxanthin softgel is completely different. Practically nothing there." *Id.* J&D therefore declined to support Piveg's insurance claim that the astaxanthin oil was contaminated. *Id.*, Ex. 13 (October 3, 2014 email from Keefe to Espinosa: "Our independent lab findings do not verify the finding you shared in your 9/19/14 email. ... It appears the presence of BHT and BHA in the finished product is the result of the Astaxanthin oil itself. Given J&D's independent findings, I am unable to provide a letter for your insurance claim."). In the same email, J&D reiterated that Piveg should "start a payment plan immediately[.] We agreed to $50,000 per month until the entire $577,675.70 is paid in full. I would like to get our first payment immediately and then establish a monthly payment date for the remaining payments." *Id.*

Finally, on November 3, 2014, J&D mailed a promissory note to Piveg reflecting the parties' new payment terms for the $577,675.70 amount: $5,000 per week, with 5% annual interest, commencing November 7, 2014. *Id.*, Ex. 21. As agreed, on November 5, 2014, Piveg submitted two checks to J&D totaling $5,000. *Id.*, Ex. 9 (check nos. 1882 & 1884). And thereafter, Piveg submitted a series of checks to J&D between November 13, 2014 and July 24, 2015, totaling $68,000. *Id.*, Ex. 9, at 161 (listing checks). Espinosa signed the promissory note on behalf of Piveg in September 2015.

Piveg tendered its claim to Golden Star on November 4, 2014, for property damage to the astaxanthin oil shipped to J&D due to BHT and BHA contamination. On March 5, 2015, General Star denied coverage, citing an exclusion for damages "arising out of ... any substance(s), ingredient(s) or compounds not listed on the product label[.]" Mot., Ex. 27 at 4. After Piveg filed this action on May 1, 2015, General Star discovered the negotiations between Piveg and J&D as well as the payments to J&D.

In General Star's motion for summary judgment, it reasserts the product label's failure to include the contaminants as a basis for denial of coverage. In addition, General Star asserts that (1) Piveg violated the "no voluntary payment" ("NVP") provision of the Policy, (2) there is no coverage under the Policy's Insuring Agreement because there never was a claim by J&D for "property damage"; and (3) even if there had been "property damage" due to contamination of the astaxanthin oil, the dispute between J&D and Piveg was contractual and excluded by the Policy's "Contractual Liability" exclusion.

## II.

## LEGAL STANDARD

Summary judgment is appropriate on "all or any part" of a claim if there is an

absence of a genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ("*Celotex*"). A fact is material when, under the governing substantive law, the fact could affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses. *See Celotex,* 477 U.S. at 323–24, 106 S.Ct. 2548.

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. "The burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial." *Miller v. Glenn Miller Prods., Inc.,* 454 F.3d 975, 987 (9th Cir.2006) (citing *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548). "[W]hen the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out the absence of evidence from the non-moving party. The moving party need not disprove the other party's case." *Miller,* 454 F.3d at 987 (citing *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548). "Thus, '[s]ummary judgment for a defendant is appropriate when the plaintiff fails to make a showing sufficient to establish the existence of an element essential to [his] case, and on which [he] will bear the burden of proof at trial.'" *Miller,* 454 F.3d at 987 (quoting *Cleveland v. Policy Management Sys. Corp.,* 526 U.S. 795, 805–06, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999) (internal quotations omitted)).

The party opposing summary judgment must "by [his or her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed. R. Civ. P 56(e)). That party cannot "rest upon the mere allegations or denials of [his or her] pleadings." Fed. R. Civ. P. 56(e).

When making its determination, the Court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] ruling on a motion for summary judgment." *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

In this case, the parties have generally agreed to a series of undisputed facts. Piveg has made objections to some evidence provided by J&D, and to the truth of some statements asserted by non-parties. However, because this matter may be resolved without resorting to the challenged evidence, the Court declines to rule on the objections.

## III.

## DISCUSSION

General Star moves for summary judgment on both claims for relief asserted in the Complaint: breach of contract and breach of the implied covenant of good faith and fair dealing. Because coverage was properly denied under the NVP provision, there is no breach of contract and thus no breach of the implied covenant. The Court therefore declines to address the remaining arguments, as denial of cov-

erage under the NVP provision is dispositive.

## A. Breach of Contract

The Policy sets out a number of conditions to coverage. *See* Mot., Ex. 1 (Policy, Section IV ("Commercial General Liability Conditions")). In Section IV, ¶ 2, the Policy specifies "Duties" of an insured in the event of an "Occurrence, Offense, Claim Or Suit[,]" including that "[n]o insured will, except at the insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense...without our consent." *Id.* Section IV, ¶ 2.d. (NVP provision).

▮▮▮▮ NVP provisions like the one at issue "typically prohibit the insured from voluntarily making payments, assuming obligations, or incurring expenses without the insurer's consent." B. Witkin, Summary of California Law, Insurance, § 320 (citing *Jamestown Builders, Inc. v. General Star Indem. Co.*, 77 Cal.App.4th 341, 346–47, 91 Cal.Rptr.2d 514 (1999)). "California law enforces such no-voluntary-payments provisions in the absence of economic necessity, insurer breach, or other extraordinary circumstances." *Jamestown Builders*, 77 Cal.App.4th at 346, 91 Cal. Rptr.2d 514 (citing *Gribaldo, Jacobs, Jones & Associates v. Agrippina Versicherunges A.G.*, 3 Cal.3d 434, 449, 91 Cal. Rptr. 6, 476 P.2d 406 (1970)). "California courts have consistently honored [no] voluntary payment provisions[.]" *Faust v. The Travelers*, 55 F.3d 471, 472 (9th Cir. 1995) (listing cases). In fact, NVP provisions apply to obligations assumed by an insured at any time before coverage is denied, if they are made without the insurer's knowledge and consent. *Low v. Golden Eagle Ins. Co.*, 110 Cal.App.4th 1532, 1546, 2 Cal.Rptr.3d 761 (2003) ("Ours is the rare case where the insured tenders the defense and *then* negotiates a settlement on its own, leaving the insurer in the dark.")

(original emphasis). Addressing unilateral settlements of third party claims by insureds, the court in *Jamestown Builders* noted:

> That means insureds cannot unilaterally settle a claim before the establishment of the claim against them and the insurer's refusal to defend in a lawsuit to establish liability. As the Supreme Court has recognized, the decision to pay any remediation costs outside the civil action context raises a "judgment call left solely to the insurer ...." (*Foster–Gardner, Inc. v. National Union Fire Ins. Co.* (1988) 18 Cal.4th 857, 883, 77 Cal. Rptr.2d 107, 959 P.2d 265 ....) In short, the [NVP] provision protects against coverage by fait accompli.

77 Cal.App.4th at 346, 91 Cal.Rptr.2d 514.

General Star argues that as of July 2014, Piveg had obligated itself to reimburse J&D for the full contract price of the rejected sale to NOW. Mot. at 10-13. In contrast, Piveg argues that it never committed to an agreement until the promissory note was signed in September 2015, which occurred well after the March 5, 2015 denial of claim. Although the NVP provision was not raised as a ground in General Star's denial of coverage, General Star reserved all other grounds for denial and therefore is not estopped from asserting the provision now. *See Westoil Terminals Co. v. Indus. Indem. Co.*, 110 Cal. App.4th 139, 152, 1 Cal.Rptr.3d 516 (2003); *Insua v. Scottsdale Ins. Co.*, 104 Cal. App.4th 737, 742–44, 129 Cal.Rptr.2d 138 (2002) (holding Cal. Ins. C. § 554 (waiver) does not apply to NVP provision not cited in initial denial letter). Piveg does not contend otherwise.

Here, if Piveg "voluntarily ma[d]e a payment, [or] assume[d] any obligation" without General Star's knowledge, the event is not covered. There is no dispute that Piveg's negotiations with J&D were volun-

tary and unknown to General Star until after this litigation commenced. Furthermore, Piveg does not dispute that the payments it made to J&D prior to General Star's denial of claim on March 5, 2015, are not covered. *See* Oppo. Br. at 16 (General Star not obligated to pay "the amount of Piveg's payments which were made prior to the denial of a defense and/or indemnity.") Here, Piveg made 12 payments to J&D between November 5, 2014 and March 2, 2015, for a total of $33,000. Mot., Ex. 9, at 161. Accordingly, Piveg concedes the NVP provision precludes recovery of those payments.

■■■■ The dispute, therefore, centers on whether Piveg "assumed an[ ] obligation" to J&D before General Star denied the claim. Under the Policy's NVP provision, General Star is not responsible for any obligation assumed by Piveg without General Star's consent. The provision is "intended 'to invest the insurer with complete control and direction of the defense or compromise of suits or claims[.]'" *Jamestown Builders*, 77 Cal.App.4th at 346, 91 Cal.Rptr.2d 514 (quoting *Gribaldo*, 3 Cal.3d at 449, 91 Cal.Rptr. 6, 476 P.2d 406 (1970)). If an insured deprives the insurer of its ability to control the defense or compromise a third party claim, there is no coverage for that claim. *See Crowley Maritime Corp. v. Federal Ins. Co.*, No. C 08–00830, 2008 WL 5071118, at *8 (N.D.Cal. Dec. 1, 2008) (no coverage under NVP provision where "settlement negotiations concluded before [insurers] were notified that they had begun."); *Faust*, 55 F.3d at 472 (tendering a defense of already-concluded lawsuit "merely a claim for reimbursement" and not covered under NVP provision); *Truck Ins. Exch. v. Unigard Ins. Co.*, 79 Cal.App.4th 966, 981, 94 Cal.Rptr.2d 516 (2000) (holding, "no-voluntary-payment provision is based on the equitable rule" that insurer is invested with complete control of defense and settlement of third party claim).

It is undisputed that Piveg agreed to reimburse J&D for the lost sale in the sum of $577,675.70 before the claim had been denied. "The amount of damages were always known to be the amount of the lost sale by J&D." Oppo. Br. at 10-11.

■■■ Nevertheless, Piveg argues it did not assume that obligation because the parties did not come to an agreement over *payment terms* until after the claim had been denied. According to Espinosa, J&D could have said until September 2015, "Okay, well, we do not agree to this [$577,-675.70 and proposed payment terms] and we're going to sue you for twice that much." *Id.*, Ex 5 (Espinosa Depo., at 63:15-17). Piveg asserts there was no agreement on payment terms until September 2015, when it signed the promissory note. In essence, Piveg argues the "assume any obligation" clause of the NVP provision requires a contract, and Piveg and J&D did not agree on all material terms to the contract until after the claim had been denied (as they had agreed only on the amount due and not on payment terms). But payment terms, though material to a contract, may not be necessary to form a contract.

■■■ In *Facebook, Inc. v. Pacific Northwest Software, Inc.*, 640 F.3d 1034 (9th Cir.2011), the court held:

[A] term may be "material" in one of two ways: It may be a necessary term, without which there can be no contract; or, it may be an important term that affects the value of the bargain. Obviously, omission of the former would render the contract a nullity. *See Citizens Utils. Co. v. Wheeler*, 156 Cal.App.2d 423, 319 P.2d 763, 769–70 (1958) (arms-length acquisition of a private company's shares couldn't proceed because *price* was omitted from the contract). But a contract that omits terms of the latter type is enforceable under California law,

so long as the terms it does include are sufficiently definite for a court to determine whether a breach has occurred, order specific performance or award damages. [Citations omitted.] This is not a very demanding test[.]

*Id.*, at 1037–38 (emphasis added) (finding enforceable settlement agreement "even though [parties] understood that some material aspects of the deal would be papered later.").

Whether an "assumed obligation" under the Policy requires an enforceable contract between the insured and third party need not be resolved here because the uncontroverted evidence establishes the existence of a contract. As discussed, Piveg does not dispute that it had "always" accepted responsibility for the lost sale. Oppo. Br. at 10-11. As stated in *Facebook*, a material term is not necessary to form a contract if the terms are otherwise "sufficiently definite for a court to determine whether a breach has occurred ... or award damages." 640 F.3d at 1038. The undisputed terms here—reimbursement of the lost sale in the sum of $577,675.70—are sufficiently definite for a court to determine breach and damages. Reviewing the contents of the emails between Keefe and Espinosa makes it clear that the parties had always agreed on those essential terms, and that their discussions on payment terms were ancillary.[1]

Moreover, while the undisputed record demonstrates Piveg and J&D agreed to the principal amount in July 2014, the parties also agreed to payment terms before the claim was denied. By its own admission, Piveg, through its CEO Espinosa, "verbally" agreed on November 3, 2014 to pay J&D $577,675.70 at 5% interest at the rate of $5,000 per week commencing November 7, 2014. Mot., Ex. 5 (Espinosa Depo. at 54:18-56:24). "[T]he moment that we agreed is when the note was drafted [November 3, 2014]. And that's why— that's when exactly we—right after that [November 5, 2014] that we started paying." *Id.* at 60:23-61:1. Espinosa further clarified, "So to me, that's how a company—a rule that we follow in the company. So to me, the moment that I was really in agreement was when we started paying to them." *Id.* at 61:14-17. Finally, Espinosa testified: "*So this is actually agreed on November 3rd, the amount and the way it was going to be paid.*" *Id.* at 64:2-3 (emphasis added).

Piveg's performance on the note bound Piveg and eliminated any need for Piveg to sign it. *See* Rest. 2d, Contracts, § 30, com. b (contract may be entered into by words of acceptance or acts of performance, unless offeror insists on specific form of acceptance); *In re Crossman's Estate*, 231 Cal.App.2d 370, 372, 41 Cal.Rptr. 800 (1964) (stating, where offeror does not prescribe manner of acceptance, any reasonable mode of acceptance may be adopted). Further, "under California law, several [emails] may collectively constitute a memorandum that satisfies the statute of frauds." *Richards Indus. Park, LP v. F.D.I.C.*, 572 Fed.Appx. 499, 502 (9th Cir. 2014) (citing Cal. Civ.Code § 1642 and *Pac. Emp'rs Ins. Co. v. City of Berkeley*, 158 Cal.App.3d 145, 204 Cal.Rptr. 387 (1984)). Also, writings composed after for-

---

1. For example, on July 21, 2014, Keefe wrote to Espinosa, stating: "Piveg agrees to purchase the finished product from J & D. J & D will provide a copy of the purchase order from our customer showing the *actual agreed upon purchase price. ... As soon as I get your response we will provide documentation and determine the best way to ... get J & D's* funds." Mot., Ex. 4 (emphasis added). Thereafter, on October 3, 2014, Keefe reiterated that Piveg should "start a payment plan immediately[.] We agreed to $50,000 per month until the entire $577,675.70 is paid in full. I would like to get our first payment immediately and then establish a monthly payment date for the remaining payments." *Id.*, Ex. 13.

mation of a contract which fill in previously undetermined material terms are permitted and satisfy the statute of frauds. *See Facebook*, 640 F.3d at 1038 (citing *Sterling v. Taylor*, 40 Cal.4th 757,766, 55 Cal. Rptr.3d 116, 152 P.3d 420 (2007) ("A memorandum satisfies the statute of frauds if it identifies the subject of the parties' agreement, shows that they made a contract, and states the essential contract terms with reasonable certainty.")[2] Here, the emails between the parties and the unsigned promissory note, followed by Piveg's acceptance by performance, satisfy all prerequisites for an enforceable contract under California law.

■ Piveg has attempted to create a triable question of fact by submitting a subsequent declaration of Espinosa, in which he states: "[¶ 44.] Although there was no formal agreement, commencing on November 5, 2014, as a gesture of good faith, Piveg began to make small payments to J&D.... [¶ 45.] This was a gesture of good faith in order to prevent J&D from ceasing all business with Piveg. This was *not* indicative of a settlement agreement having been reached. ... [¶ 47.] An agreement was reached between Piveg and J&D in **September 2015**, whereby Piveg and J&D signed a promissory note ...." Espinosa Decl., at ¶¶ 44, 45 & 47 (original emphasis).

■ "'The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.'" *Yeager v. Connie Bowlin, et al.*, 693 F.3d 1076, 1080 (9th Cir.2012) (citations omitted). As noted in *Yeager*, the "sham affidavit rule prevents 'a party who has been examined at length on deposition' from 'rais[ing] an issue of fact simply by submitting an affidavit contradicting his own prior testimony,' which 'would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.* (citations omitted).

■ To trigger the sham affidavit rule, the district court "must make 'a factual determination that the contradiction is a sham, and the 'inconsistency between a party's deposition testimony and subsequent affidavit must be clear and unambiguous to justify striking the affidavit.'" *Id.* (citation omitted). Here, the inconsistencies between the deposition testimony and affidavit are clear and unambiguous: (1) there was an agreement on November 3, 2014, including principal amount due and payment terms; there was not an agreement until September 2015, when the promissory note was signed; and (2) payments were made under the promissory note; payments were merely "a gesture of good faith" entirely divorced from the note. Espinosa does not defend the inconsistencies on grounds of newly remembered facts, or new facts; no explanation is offered. Further, the testimony provided at deposition was detailed, repeated several different times in response to several different questions, consistent with stated company practices, and consistent with general contract law (as discussed above). The deposition testimony also was provided before the importance of the issues became apparent after the filing of the summary judgment motion. The Court therefore finds the contradictions are manufactured and strikes those portions of the affidavit.

---

**2.** "[T]he writing requirement of the statute of frauds 'serves only to prevent the contract from being unenforceable[.]'" *Sterling*, 40 Cal.4th at 766, 55 Cal.Rptr.3d 116, 152 P.3d 420 (citation omitted). "The primary purpose of the Statute [of frauds] is evidentiary, to require reliable evidence of the existence and terms of the contract and to prevent enforcement through fraud or perjury of contracts never in fact made." *Id.* (quoting Rest.2d Contracts, § 131, com. c, p. 335).

Here, J&D accepted payments on the promissory note without Piveg's signature for almost a year. A final agreement, commemorated in writing, and accepted via performance of the agreement's terms is binding on the parties. So it is here. The parties set out their final agreement in their promissory note, and Piveg accepted by performance by making the first scheduled payment, and others. These objective, undisputed facts establish a binding agreement as a matter of law. In this regard, even if the Court declined to strike the noted portions of the Espinosa declaration, the declaration would not create a material question of fact because Piveg accepted the obligation ($577,675.70 and payment terms) by its performance; Espinosa's subjective intent is irrelevant under the circumstances.[3]

██ Finally, Piveg cites *Jamestown Builders* for the proposition that an NVP provision "is superseded by an insurer's antecedent breach of its coverage obligation." 77 Cal.App.4th at 348, 91 Cal. Rptr.2d 514. "An insured that has been abandoned by its carrier and left exposed to the possibility of a default judgment may protect its own interests by entering into a reasonable settlement without losing its right to recover on the policy." *Id.* at 347–48, 91 Cal.Rptr.2d 514 (citation omitted). This argument fails because Piveg assumed the J&D obligation before General Star denied the claim. Accordingly, California law is clear that General Star is not liable for any payments made or obligations assumed in violation of the Policy's NVP provision.

Notably, had Piveg *not* agreed to reimburse J&D for the failed sale to NOW, the undisputed evidence shows that any claim by J&D against Piveg would have been based on Piveg's alleged failure to provide all-natural astaxanthin oil, not contamination due to excess levels of BHT or BHA. Mot., Ex. 13 (October 3, 2014 email from Keefe to Espinosa: "Our independent lab findings do not verify the finding you shared in your 9/19/14 email. ... Given J&D's independent findings, I am unable to provide a letter for your insurance claim."). Thus, on this record, any third party claim by J&D against Piveg would not have included allegations of contamination (which arguably trigger coverage under the Policy's "property damage" provisions). By agreeing to reimburse J&D, Piveg allowed itself to tender the J&D claim on theories designed to trigger coverage and unmoored to claims that J&D actually would have alleged. Indeed, after Piveg resolved its dispute with J&D, Piveg presented the claim to General Star for "coverage and defense ... based upon a claim for property damage *by J&D* ... in the amount of $577,675.70." *Id.*, Ex. 2 (tender letter) (emphasis added). Piveg thus attempted to set the stage for coverage by expressly attributing to J&D a property damage claim that J&D had previously rejected. That Piveg cannot do, as "the [NVP] provision protects against coverage by fait accompli." *Jamestown Builders*, 77 Cal.App.4th at 346, 91 Cal.Rptr.2d 514. General Star did not breach its insurance contract with Piveg under these undisputed circumstances.

---

3. Piveg points to an email dated March 24, 2015, in which Keefe complains that although Piveg had been making payments on the obligation Espinosa had not yet signed the promissory note, and thus Keefe requested that Piveg begin making payments of $50,000 per month. Espinosa Decl., ¶ 46; Mot., Ex. 11 (email). This, according to Espinosa, "clearly demonstrates that there was no meeting of the minds or agreement" until the promissory note was signed in September 2015. Espinosa Decl. ¶ 46. However, as discussed, a contract was formed when Piveg commenced payment under the terms of the promissory note.

## B. Breach of Implied Covenant of Good Faith and Fair Dealing

Insurers, like any party to a contract, owe a general duty of good faith and fair dealing attendant to the contract. *Seaman's Direct Buying Service, Inc. v. Standard Oil Co.*, 36 Cal.3d 752, 768–69, 206 Cal.Rptr. 354, 686 P.2d 1158 (1984). This is heightened in an insurance contract because of the special relationship between the parties. *See Foley v. Interactive Data Corp.*, 47 Cal.3d 654, 683–93, 254 Cal.Rptr. 211, 765 P.2d 373 (1988). To establish a breach of this duty, an insured must prove that benefits due under the policy were unreasonably and improperly withheld. *See California State Auto. Ass. Inter–Ins. Bureau v. Superior Court*, 184 Cal.App.3d 1428, 1433, 229 Cal.Rptr. 409 (1986). Piveg argues that benefits were due under the Policy, and that General Star conducted an inadequate investigation of the claim. Because benefits were not due, any alleged inadequate investigation would be irrelevant. Policy benefits must be wrongfully withheld in order to support a claim for breach of the implied covenant of good faith and fair dealing. *See, e.g., Love v. Fire Ins. Exchange*, 221 Cal.App.3d 1136, 1153, 271 Cal.Rptr. 246 (1990). Therefore, there was no breach of the implied covenant.

## IV.

## CONCLUSION

For the above reasons, General Star's motion for summary judgment is granted. The Clerk of Court shall enter judgment in favor of General Star and against Piveg.

**IT IS SO ORDERED.**